## William H. Fleet v. Henry L. Hertz, for use, etc.

1. **PROFERT**—*When it, or an Excuse for it, is Necessary—Practice.*— At common law, where a profert, or excuse for the want of it, is necessary, if the plaintiff professes to produce the instrument when he is not prepared to do so, the defendant is entitled to oyer, and if he pleads *non est factum* the plaintiff will be non-suited on the trial as it will not be sufficient in such a case that the instrument was lost or destroyed or in the possession of the defendant. But under our practice it is not necessary in any case, to make profert, and consequently it is not necessary to aver any reason or excuse for not making it.

2. **REPLEVIN BOND**—*Duty of Officers in Taking.*—Under our practice, officers taking a replevin bond are required to return the same into court with the replevin writ and upon so being returned the bond becomes a record of the court.

3. **LOST INSTRUMENTS**—*Pleadings in Suit upon.*—In an action upon a lost note, it is not necessary to declare upon it specially as a lost instrument.

4. **COMMERCIAL TRANSACTIONS**—*When Bailments and When Sales.*—

Where the identical thing delivered is to be restored, though in an altered form, the contract is one of bailment and the title to the property is not changed; but where there is no obligation to restore the specific article, and the receiver is at liberty to return another thing of equal value, he becomes the debtor to make such return, and the title is changed; it is then a sale.

5. SAME—*When a Person is a Purchaser and Not an Agent to Sell on Commission.*—Where one takes goods to be sold on commission and it is doubtful whether or not he has become the purchaser or mere agent to sell, one of the main tests is, if he is given an option to pay for the goods and keep them, then it is a sale of the goods and the title passes to such person absolutely, as a matter of law.

**Debt,** on a replevin bond. Appeal from the Circuit Court of Cook County; the Hon. FRANK BAKER, Judge, presiding. Heard in this court at the March term, 1901. Affirmed. Opinion filed December 12, 1901.

CHURCH, McMURDY & SHERMAN, attorneys for appellant.

MOSES, ROSENTHAL & KENNEDY, attorneys for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

This is an appeal from a judgment rendered in an action of debt on a replevin bond, executed by appellant and Barbette Lehman, his surety, to Henry L. Hertz, the coroner of Cook county, in a replevin suit by appellant against James H. Gilbert, formerly sheriff of said county. The alleged breaches of the condition of the bond are that appellant did not return the goods replevied, and did not prosecute his replevin suit with effect. That there were such breaches is not controverted. It appears from the evidence that appellant dismissed the replevin suit without a trial on the merits, which fact was pleaded by appellant in the present suit, and also that he had title to the property replevied, in accordance with section 26 of the practice act. Such proceedings were had that the jury found the issues for appellee, under the instructions of the court, and found the debt to be $7,000, the penalty of the bond, and assessed the damages at the sum of $2,248.93, and judgment was rendered on the verdict.

Appellant's counsel urge that the court erred in admit-

ting secondary evidence of the bond, because it is not averred in the declaration that the bond was lost, and urge further that there was no proof of the loss of the bond sufficient to warrant the admission of secondary evidence of its contents. Profert of the bond is not made in the declaration, nor is its loss alleged, nor did appellant crave oyer. Chitty says:

"But where a profert, or excuse for the want of it, is necessary, if the plaintiff profess to produce the deed when he is not prepared to do so, the defendant is entitled to oyer, and if he plead *non est factum*, the plaintiff will be non-suited on the trial, as it will not be sufficient in such case that the deed was lost or destroyed, or in the defendant's possession," etc.    1 Chitty on Pl., 5th Am. Ed. 314, 315.

It will be observed that what is said in the above quotation applies only to cases in which profert, or the excuse for the want of it, is necessary; also that the consequence of failing to produce the deed, on oyer craved, after making profert, is limited to a case in which the defendant pleads *non est factum*. But under our practice it is not necessary in any case to make profert, and consequently it can not be necessary to aver any reason or excuse for not making it. Section 19 of the practice act is as follows:

"It shall not be necessary, in any pleading, to make profert of the instrument alleged; but, in any action or defense upon an instrument in writing, whether under seal or not, if the same is not lost or destroyed, the opposite party may have oyer thereof, and proceed thereon in the same manner as if profert had been properly made, according to the common law."

Again, the consequence of being non-suited, in the case put by Chitty, results from the effect of the plea of *non est factum* at common law. At common law that plea was not required to be verified, and it put the plaintiff on proof of the execution of the deed declared on, whereas, by section 34 of the practice act, the plea of *non est factum*, to have that effect, must be verified by affidavit, which appellant's plea of *non est factum* is not. In the present case, appellant did not crave oyer, and had he so done, appellee might have alleged any matter of fact as ground why oyer

should not be demanded, as, for instance, that the bond was lost.   Heard's Stephens on Pl., 9th Am. Ed., Sec. 72.

By section 11 of the practice act the officer taking a replevin bond is required to return the bond into court, with the replevin writ, and the bond, on being so returned, becomes a record of the court.

At common law profert of a record was not necessary, nor could oyer of it be demanded.   Heard's Stephens on Pl., Sec. 69; Jevens v. Harridge, 1 Saunder's Rep., 8 b.

In that case the following occurs:

" The defendant in the common bench could not have oyer of the record of a judgment in the court of Kingston-upon-Hull, because the record was not in the court of common bench, but remained in the inferior court."

In the present case, the declaration avers, in accordance with the fact, that the bond sued on was filed in the Superior Court of Cook County.

In a suit on a lost note, it is not necessary to declare on it specially as a lost note.   Dormady v. State of Illinois, 2 Scam. 236–244.

Appellant's counsel, in their argument, say :

" It would be manifestly unjust to permit a party to declare upon an instrument alleged to have been executed by the defendant, in such form as to lead the defendant to believe that the original itself will be produced on the trial, and then to confront him, at the trial, with secondary evidence of its contents only."

In the present case, appellant could not have been so deceived, because he knew, as appears by evidence hereinafter mentioned, that the bond sued on was lost.   We can not perceive that appellant was prejudiced by the omission ·of appellee to aver loss of the bond.   The fact that he did not crave oyer, as by the statutes he might have done, is evidence that he did not deem the production of the original necessary for his defense.

Albert G. Mang, deputy clerk of the Superior Court, testified where such bonds were usually kept, and that he had made a thorough search for the bond in every place where it would be likely to be, and could not find it.   There was

also put in evidence an order of the Superior Court in the replevin suit, of date April 10, 1897, finding that August 24, 1900, William H. Fleet and Barbette Lehman executed to Henry L. Hertz, coroner, etc., a bond, reciting the bond so found to have been executed, and ordering Fleet to present to the court within ten days a new replevin bond in the sum of $7,000; also an order made by said Superior Court, in said replevin suit, of date July 14, 1897, as follows:

"On motion of plaintiff's attorneys, it is ordered that leave be given and is hereby given the plaintiff to file a copy of his declaration, *nunc pro tunc* as of August 31, 1892; and leave to file a copy of affidavit for replevin, *nunc pro tunc* as of August 23, 1892; and leave to file a copy of replevin writ and bond, *nunc pro tunc* as of September 8, 1892; all of the same in lieu of originals lost."

On such proof being made, the court admitted in evidence a copy of the bond, the same in terms as the bond recited in the order of the Superior Court, of April 10, 1897, and which that court found was executed by appellant and his surety, Mrs. Lehman. Appellant's counsel objected to the admission of the evidence, on the ground that the bond was not declared on as lost, and that the proof of loss was insufficient, which objections were, as we think, properly overruled. In their argument counsel urge that there was no proof that the copy offered in evidence was a true copy of the original. As to this objection it is sufficient to say that it was not made when the copy was offered, and it can not properly be made here. Had the objection been made in the trial court, we think it should have been overruled, the copy being in terms the same as the Superior Court found the original was.

We think the foundation laid for the introduction of the copy amply sufficient. Counsel for appellee contend that the order of July 14, 1897, is not binding on Mrs. Lehman, the surety; that without proof of such order there could have been no judgment against Mrs. Lehman, and, if the judgment against her is erroneous it is also erroneous against Fleet. The argument is fallacious. Mrs. Lehman has not

appealed from the judgment, and is not here complaining, and she, as appellant's surety, is bound by all the steps her principal, in good faith, took in the prosecution of the replevin suit. Cobbey on Replevin, Sec. 1314; Pirkens v. Rudolph, 36 Ill. 306, 308.

We have considered the foregoing objections of appellant's counsel at, perhaps, too great length, because of the elaborate arguments of counsel on both sides of the questions involved. We now proceed to a consideration of the merits.

August 18, 1892, four judgments by confession were rendered in the Superior Court of Cook County against S. A. Kessler and Isidore Kolb; one in favor of H. B. Masser for $2,000; one in favor of Simon N. Zemanski for $3,156; one in favor of Charles Glanz for $1,500, and one in favor of Isidore Jonas and Newman Krijariski for $2,000. Executions were issued on all of said judgments on the day the judgments were rendered, but the sheriff's returns on the executions show that the execution on Zemanski's judgment was first received by the sheriff. The return of that execution by the sheriff, James H. Gilbert, shows that he levied the execution on all the right, title and interest of the defendants, Kessler and Kolb, in certain described personal property, describing the property, which described property includes, with other property, that taken from the sheriff by the coroner by virtue of the replevin writ issued in the suit of Fleet, the appellant, against James H. Gilbert, in the Superior Court of Cook County, which is the property in question in this case. The sheriff's return also shows, that certain of the property so levied on was taken from him by virtue of certain writs of replevin issued from said Superior Court, among which writs was the writ issued in the replevin suit of Fleet v. Gilbert; and that August 28, 1892, he sold the remainder of the property, not so taken, for the sum of $2,441.98, of which, after deducting fees and costs, there remained $1,854.88, which he paid to the plaintiff's attorney. The sheriff returned each of the other three executions, that he levied it on the same property on which he levied the Zemanski execution, referring to his return

on that execution, and making it part of his return on each of the other executions, and stating that there not being sufficient property to satisfy the execution, he returned it unsatisfied.

The question to be determined is whether appellant can claim title to the property replevied, as against the execution creditors represented by the sheriff, and the determination of this question depends on the facts, which are substantially as follows:

William H. Fleet, the appellant, was a dealer in New York City in furs, fancy skins, goat rugs, robes, etc., and S. A. Kessler and Kolb, under the name of the S. A. Kessler Fur Company, were engaged in the fur business, including the manufacture of skins into garments, etc., in Chicago. Appellant, for about six years prior to March, 1892, had business relations with the Kessler Company and had sold them during those years about four hundred dollars' worth of goods annually. Such being the relation between appellant and the Fur Company, the following correspondence took place:

"NEW YORK, March 30, 1892.

S. J. KESSLER, ESQ., Chicago, Ill.

DEAR SIR: Your favor of the 25th inst. has been duly received and enclosed check for $160 I passed with thanks to your credit, against your note, which annexed I beg to return to you. For remaining 64 cts. I beg you kindly to remit to me at next opportunity by mail.

I can not fill an order for 100 goat rugs at less than $2.50, and the best goods, dyed black, are $2.75, at which price I am selling thousands of them here.

In fancy color goats I am not ready yet to offer my new colors. I have large quantities of goods such as the fur manufacturers here are buying and I have no doubt that I have many bargains for you, and I try to fix matters so that I could ship you a great deal of stuff.

Most of these goods, as you know, I am selling for ac. for other people, and as the mercantile agencies do not rate you very high, I can not sell you the same outright, and guaranteeing to my fellows for the very small commission I get, that would not pay.

My desire is to help you all I can do, as I assured you on former occasions. As I am now very anxious to help you

Fleet v. Hertz.

I will do this: I consign to you a $1,000 worth of goods which you agree to handle for my account and hold the proceeds in trust, making settlement within thirty, sixty or ninety days, as soon as the money may be collected. Now I am sure that this must be satisfactory to you, and you might send in your orders for the following goods:

Belgium Coney, red label, case lots.

| | | |
|---|---|---|
| Assorted 25 xx 50 xxx 25 xxxx...............$2 20 | | |
| | 25 xx.................. | |
| dto black label c lots | 50 xxx............... | 2 35 |
| | 25 xxxx.............. | |
| | 24 xx................. | |
| dto blue    "    " | 50 xxx............... | 3 50 |
| | 25 xxxx.............. | |

Chinchilla Hares, same as had:................. 5 00
Silver Rabbits, medium quality................. 2 75
     Terms on above goods: On all money remitted within 30 days, 6 per cent off; 60 days, 5 per cent off; 90 days, 4 per cent off.
Seal, Copper Island..............$25 00 and upward.
Thibet Crosses.................. 15 00   "    "
Angora Goat, Turk skins......... 6 50
Cape Angora.................... 3 50  "    "
Goat Rugs, $2.50, $2.75 of black.
(Reefer) Reefer stock.

These later articles all net thirty, sixty or ninety days, as you might collect the money.

If you want anything else, let me know. Now send some orders along.

Very truly,

WM. H. FLEET."

" CHICAGO, April 2, 1892.

DEAR FRIEND FLEET:

Yours of the 30th at hand. Inclosed please find 64c postage stamps, amount due you on the note. Your proposition of handling your goods on consignment is perfectly satisfactory to us. I am glad you have found a way of doing business with us on safe basis which I trust will be satisfactory to both. I am only sorry that we had not made these arrangements while I was in your city for we have used at least $10,000 worth of goods since, and a great many of these goods could have been bought of you; but being in the position we are in at present, we had to buy from different houses the goods we had orders on at terms suitable.

I have often thought of writing to you for certain goods, but I have not had enough nerve to do it as I thought our limit with you is full. Now, Mr. Fleet, I will try and do business with you satisfactory to you, and will show you that I appreciate your favors in every way.

Please send us by U. S. Express following goods:

100 goat rugs.............................$2.50
100 doz. Belgium, Coney, Red label........$2.20
50 astrachan plates, if you have any in stock, .
    at..................................$4.50

We also like to get fifty dozen of J. K. Lynx hare at $5.25. A sample of silver rabbits and samples of all light color goats. If you have tiger cats, please send us all you have dressed, not exceeding 100 skins. Kindly try and keep us posted on everything new that you may get as we have the trade and can always place it into the market. In regards to money matters, I wish to say to you that all the notes you have of us will be honored promptly, and we shall remit to you as fast as we realize from your goods we may order, which shall at no time exceed the terms mentioned in your letter.

Trusting to see you in your city next month, I remain,
                    Yours very truly,             .
                    S. A. KESSLER FUR CO.,
                        Pr. S. A. Kessler."

Under the arrangement mentioned in appellant's letter of March 30th, assented to by the Fur Company by their letter of April 2d, quantities of goods, including the goods in question, were shipped to the Fur Company by appellant, and were received by the company. In appellant's brief the letters of March 30th and April 2d are referred to as "the original contract under which these goods were shipped." There was, subsequent to April 2, 1892, other correspondence, to which, and the acts of the parties in the premises, reference will be hereinafter made. The first question is, whether, as between appellant and the execution creditors, the agreement under which the goods were delivered by appellant to the Fur Company, was or not, in law, a sale. Appellant's letter of March 30th clearly contemplates sales of the goods by the Fur Company. It does not limit the terms or prices in sales by the company. The company is left at liberty to sell for cash or on credit, as it

might choose, and in its own name. No commission or compensation is fixed for its services in making sales. There is no provision for a return to appellant of any of the goods, nor any provision for a lien on the goods. The letter does not even purport to retain any interest in the goods. The language is:

"I consign to you a $1,000 worth of goods, which you agree to handle for my account and hold the proceeds in trust, making settlement within thirty, sixty or ninety days, as soon as the money is collected."

Appellant's letter indicates that he considered the transactions to take place in pursuance of his letter as sales, but differing somewhat from sales by him to other persons. He writes: "Most of these goods, as you know, I am selling for other people, and as the mercantile agencies do not rate you very high, I can not sell you the same outright," etc. Appellant and the Fur Company evidently contemplated that the company would sell the goods at retail and at a profit on the prices appellant charged the company. The delivery of goods to the Fur Company, under the arrangement mentioned, was not a bailment.

"When the identical thing delivered is to be restored, though in an altered form, the contract is one of bailment, and the title to the property is not changed; but, when there is no obligation to restore the specific article, and the receiver is at liberty to return another thing at equal value, he becomes the debtor to make the return, and the title to the property is changed; it is a sale." Lonergan v. Steuart, 55 Ill. 44, 49; Wetherell v. O'Brien, 140 Ib. 146; St. L. Iron & Machine Works v. Kimball, 53 Ill. App. 636; Benjamin on Sales, 6th Am. Ed., p. 5, note.

Neither was it a consignment for sale on commission.

In Upham v. Richey, 62 Ill. App. 650, 654, the court say:

"It is a principle of law, if one takes goods to be sold on commission, and it is doubtful whether he has become the purchaser, one of the main tests as to whether he is a purchaser or mere agent to sell on commission, is, if he is given the option to pay for the goods and keep them, then it is a sale of the goods, and the title passes to the consignee absolutely, as a matter of law. It is a sale, and the goods are not the property of the consignor."

The case cited was affirmed by the Supreme Court, on appeal, 163 Ill. 530. There can be no doubt, in the present case, that the agreement between appellant and the Fur Company contemplated that the company should keep and pay for the goods.

T. & Co. were in the habit of sending goods for sale to one N., who was a member of the firm of N. & Co., accompanying the goods sent with a price list of them. N. sold the goods on such terms as he pleased, and sent an account to T. & Co. monthly, debiting himself with the price given in the price list for goods sold by him, but not specifying the prices at which he had sold the goods, or mentioning the names of the purchasers. N., in his dealings with T. & Co. acted solely on his own behalf, and not in behalf of his firm, but deposited the money received by him on sales of the goods sent him by T. & Co. with his firm, in the books of which were kept an account of the moneys so deposited and moneys drawn out of such account. The moneys so deposited with the firm were placed to the credit of the firm in their general account with their bankers. Payments made to T. & Co. on account of goods sent by them to N. were partly by bills received by N. from purchasers of the goods, and partly by checks of his firm. N. & Co. made an assignment, when there was a balance on their books to the credit of N., and T. & Co. offered to prove for said balance, claiming that it was trust money improperly paid by N. to his firm. The court held against the claim, saying:

" It is clear from the course of dealing that the bargain was substantially this: Mr. Nevill was to dispose of the goods sent to him by Towle & Co. and was not to pay for them unless he disposed of them, and he was to return, at the end of every month, an account of sales that he had actually made; and then, after the lapse of another month, he was to pay in cash for the amount of the goods which he had so disposed of, according to their values as fixed by a price list sent to him. It does not appear that he ever was expected to return any particular contract, or the names of the persons with whom he had dealt. He pursued his own course in dealing with the goods, and fre-

quently before sale he manipulated them to a very considerable extent by pressing, dyeing, and otherwise altering their character, changing them as much as wheat would be changed by being turned into flour; and he sold them on what terms he pleased as to price and length of credit.   No question appears ever to have beeen raised as to whether he was entitled to do this; and we must take it that he did not commit any breach of duty in so doing.   That is quite inconsistent with  the notion that he was acting in a fiduciary character in respect of those goods.   If he was entitled to alter them, to manipulate them, to sell them at any price that he thought fit after they had been so manipulated, and was still only liable to pay for them at a price fixed beforehand, without any reference to the  price at which he had sold them, or to anything else than  the fact of  his having sold them in a certain month, it seems to  me  impossible to say that the produce of the  goods so sold was the money of the consignors, or that the relation of vendor and purchaser existed  between  Towle & Co. and the  different persons to  whom  he sold the goods."   Ex parte White, L R., 6 Ch. Cases, 397; see, also, In re  Linforth, 4  Sawyer, 370, U. S. Ct. Rep., 9th Circuit.

In the last case the court say :

" By the agreement  between  the bankrupts and the petitioners, the  latter agreed to 'furnish' the bankrupts goods of their manufacture, at a fixed price.   The bankrupts were to pay all  freight, storage, and  charges on the goods shipped  to them.   They had  the right  to  sell or dispose of them in any manner, and for such prices and on such terms as they chose, and  were to pay, at the expiration of  three months, a fixed price for all  goods sold or shipped from their warehouse.   They were  not  bound to render any account sales to their consignors.   The agreement speaks, it is true, of an account of sales to be rendered by the bankrupts, but this evidently means an account or statement of the articles sold  or shipped  from their warehouse, for which they were to pay the agreed price every three months.   They were not bound to render any account of the prices obtained by them, or of the terms of sale.   At the end of the year they were  bound to pay, if required, for all goods remaining on hand.   It is plain that this transaction in no respect resembles a  consignment by a principal to a factor, of goods to be sold on commission.   It is a consignment of goods to be paid for  at a  price agreed upon, and which bore  no  relation to the prices at which

the consignees might sell, or the amounts they might be able to collect."

That the transactions were not assignments for sales on commission, is evidenced by the fact that no provision was made for the receipt of commissions by the Kessler Company.

Transactions under the agreement between appellant and the Fur Company being neither bailments nor consignments for sale on commission, the conclusion seems inevitable that they were sales.

We think it too plain for argument, that there was no privity of contract between appellant and the purchasers of the goods from the Fur Company, and that appellant could look only to the company for payment for the goods he shipped to them.

When appellant wrote the letter of March 30th and the propositions therein contained were accepted by the letter of April 2d, he knew that Kessler and Kolb were engaged in the fur business in Chicago on their own account. The agreement evidenced by those two letters, concisely stated, was that appellant would sell goods to Kessler and Kolb on a credit of thirty, sixty or ninety days, at such prices as might be agreed on between them, they to pay for the same when they should collect the money from their customers, but at least within thirty, sixty or ninety days. The agreement contains no restriction as to the name in which they should sell or the prices or the terms of sale, whether for cash or on credit, or the character of the purchasers. That the agreement evidenced by the letters mentioned was for a sale or sales, is supported by the following cases :

Chickering v. Bastress, 130 Ill. 207. Chickering & Sons, manufacturers of pianos in New York City, entered into a written agreement with Pelton, Pomeroy & Cross to forward and deliver to the latter all pianos of their manufacture which they, Pelton, Pomeroy & Cross, might need in their business in Chicago, on terms expressed in the agreement. The court, in the opinion, states the main provisions

Fleet v. Hertz.

of the agreement, on which the decision depended, as follows :

"1. That the prices at which Pelton, Pomeroy & Cross were to take the pianos of the Chickerings were to be agreed upon and expressed in the invoices. 2. Pelton & Co. were to pay out of their own pockets all freight charges and costs of shipment, to keep them insured for the benefit of the Chickerings, the former paying the premiums. 3. Pelton & Co. were at liberty to sell the pianos at such prices as they chose to fix upon them, and to have all they could get over and above the invoice prices, in full for all charges, commissions, expenses, etc. When they sold one or more they were to remit the invoice price to the Chickerings, and that should be in payment and discharge for the pianos so sold. 4. Advances might be made by Pelton & Co. by negotiaable paper, and when such paper was paid it should transfer the title to the particular pianos for which such paper was given. 5. All pianos delivered by the Chickerings to Pelton & Co. were subject to the order of the former, and their right to transfer, remove, sell or repossess themselves of the same, at any time, without notice."

The court, after stating the distinction between a sale and a bailment, substantially as hereinbefore stated, and after holding that the agreement was neither a bailment nor a consignment for sale, say, in reference to the agreement :

" Its real purpose was to cover up a sale and preserve a lien in the Chickerings."

In respect to the attempt to preserve a lien, the court say :

"In Thompson v. Pratt, 94 Pa. St. 275, the court say : 'Whatever the form of the agreement, if its purpose was to cover up a sale and preserve a lien in the vendors for the price of the goods, it was void as respects creditors, whether the credit was given before or after the delivery of the goods. A consignment for such objects is no better than any other device.' The same view was taken in Murch v. Wright, *supra*, where the device was a pretended lease. So, also, in Hervey v. Rhode Island Locomotive Works, *supra*. The cases cited are authority for the doctrine that where one party, by means of contract, but without notice to the world, suffers the real ownership of chattels to be in himself, and the ostensible ownership to be in another, the law will postpone the rights of the former to those of the exe-

cution or attachment creditors of the latter, because, to injure third persons by giving a false credit to such ostensible owners, is the natural and probable result of the transaction." Citing cases.

In Fifield v. Farmers Nat. Bank, 148 Ill. 163, 172, the court say :

"In the sale of a chattel, when the possession of the property passes to the purchaser, a secret lien in favor of the vendor is not valid as against creditors or subsequent purchasers," citing Chickering v. Bastress.

In Peoria Mfg. Co. v. Lyons, 153 Ill. 427, there was a contract in writing between the Manufacturing Company, first party, and Weaver & Hutchins, of Virginia, Illinois, second parties, which was, in substance :

1. That the first party was to forward and deliver to second parties, farm wagons, plows, etc., as might be ordered by the second parties on commission. 2. Second parties to sell the goods at retail prices, the difference between invoice and retail prices to be their commission. 3. The second party to be at liberty to take from purchasers of the goods, notes payable to order of second parties, they to turn over such notes to the first party with their guaranty that they should be paid at maturity, when, if not paid, the second parties should pay them. 4. Second parties to advance to first party their notes for full amount of goods ordered, when received by second parties; said notes, however, not to be deemed a settlement; the proceeds of goods sold by second parties to be credited on said notes. 4. Second parties to keep all goods well housed and fully insured, and, at the termination of the agreement, to return all goods to Peoria free of freight, at option of first party.

The court held that the title to the property passed to Weaver & Hutchins, and was subject to the execution of a judgment creditor, which had been levied on it. The court adopted the opinion of the Appellate Court, in which the following occurs :

"The doctrines announced by our Supreme Court in the case of Chickering et al. v. Bastress, 130 Ill. 206, are applicable to the questions here discussed, and fully support the conclusions we have reached."

In the present case, as in the case of Chickering v. Bas-

Fleet v. Hertz.

tress, the purpose of the arrangement was to cover up a sale of the goods, under the pretense of a consignment, and to preserve a lien to appellant on the proceeds of sales by the Fur Company.  Appellant, in his letter of March 30th, which, with the letter of the Fur Company of April 2d, constitutes the arrangement under which the goods in question were sold, says :

" I consign to you $1,000 worth of goods, which you agree to handle for my account, and hold the proceeds in trust," etc.

It is manifest that if such trust could be created between appellant and the Fur Company, it could not affect the rights of *bona fide* purchasers of the goods from the latter, or the rights of its execution creditors.

Other cases might be cited to the same effect as those cited *supra*, but we think further citation of authorities on the question whether the arrangement was for a sale or sales, unnecessary.

It can not be successfully contended that a purchaser from the Fur Company of goods delivered to the company by appellant, under the arrangement in question, would not acquire good title to the goods purchased, free from any valid claim of appellant, and an execution creditor occupies the same position as a *bona fide* purchaser.  Van Duzor v. Allen, 90 Ill. 499.

Both parties to the arrangement, by their subsequent conduct, treated it as one for sales.  In a letter from appellant to the Kessler Co., of date April 13, 1892, he writes:

" Your order for 150 tiger cat skins and twenty-five Astrachan crosses has been booked with thanks, and, referring to same, I beg to say that I am forwarding to you, by express, the twenty-five Astrachan plates.  Regarding tiger cats, would say that many of the skins come back from the dyer too poor to send to you.  If you agree to take the same as they run, I can give you a couple hundred at $1.25 per skin, but not selected," etc.

In a letter to the Fur Company of date May 26, 1892, he writes :

" Certainly you can not find any fault with my prices, as

I do not know where you could buy goods. of similar quality at such cheap prices."

In the same letter he dunned Kessler & Co., for money. Subsequently he accepted from the company two notes amounting to $447.75, which the company had received from their customers. He frequently calls on Kessler & Co. for money, but never requests a return of any of the goods delivered to them. As to Kessler and Kolb constituting the S. A. Kessler Fur Co., it is sufficient to say that they acted in all respects as if the goods sent them by appellant, under the agreement between him and them, were theirs, with liberty to do with them as they pleased.

The court gave to the jury the following instruction :

" The court instructs the jury, as a matter of law, that the undisputed evidence in this case shows the transactions between the S. A. Kessler Fur Company and the defendant, William H. Fleet, in respect to the goods in question, to be a sale and not a consignment, and you should, therefore, find the issue as to the ownership of said property in favor of the plaintiff."

, This instruction is objected to. The letters of March 30th and April 2d constituted an agreement between appellant and the S. A. Kessler Fur Co. as to goods to be delivered by appellant to the company thereafter; all goods delivered by appellant to that company, including the goods in question, were delivered under that agreement, and it was a question of law to be determined by the trial court, whether the agreement was an agreement for a sale or sales. Chickering v. Bastress, 130 Ill. 214; Graham v. Sadler, 165 Ib. 95.

We think the instruction correct. The court, by other instructions, left the question of damages to the jury, which, as we think, was the only question in the case proper to be submitted to the jury. It is not assigned as error, or contended by appellant's counsel, that the damages assessed are excessive.

The motion of appellee to strike appellant's bill of exceptions from the files will be overruled, and the judgment will be affirmed.