## WILLIAM H. FLEET
*v.*
## HENRY L. HERTZ.

*Opinion filed February 18, 1903—Petition stricken from files April 9, 1903.*

1. CONTRACTS—*when a contract creates relation of agency and not of vendor and vendee.* An accepted offer from an importer to a fur company for the latter to handle goods for the importer's account, "and hold the proceeds in trust, making settlements within thirty, sixty or ninety days, as soon as the money is collected," creates the relation of principal and agent and not that of vendor and vendee, particularly where the offer states the importer cannot sell the company goods outright. (MAGRUDER, C. J., dissenting.)

2. SAME—*what does not convert a contract of agency into one of sale.* That an agent failed to remit for goods as soon as the money was collected, and that the principal accepted certain notes of the agent's customers given in payment for goods other than those furnished by the principal, does not convert the relation of agency, created by the contract, into the relation of vendor and vendee.

3. PRINCIPAL AND AGENT—*principal's property not subject to execution against agent.* Property of a principal in the hands of his agent for purposes of the agency is not subject to levy and sale on an execution against the agent.

4. SAME—*test in determining whether transaction is a consignment to an agent, or a sale.* In determining whether a transaction is a consignment to an agent for sale on the principal's account or a subterfuge to conceal an actual sale, the chief test is whether or not the relation of debtor and creditor is created between the parties upon the transfer of possession of the goods.

5. ESTOPPEL—*when a party cannot complain that copy of bond is admitted in evidence.* If the plaintiff in a replevin suit substitutes, by leave of court, a copy of the replevin bond for the original, which has been lost, he cannot complain that such copy is admitted against him in a subsequent suit upon the bond.

6. ACTIONS AND DEFENSES—*a suit at law may be maintained on lost bond.* Since the abolishment of profert by section 19 of the Practice act, an action at law may be maintained upon a lost instrument under seal.

*Fleet* v. *Hertz*, 98 Ill. App. 564, reversed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. FRANK BAKER, Judge, presiding.

CHURCH, McMURDY & SHERMAN, for appellant.

MOSES, ROSENTHAL & KENNEDY, and JAMES A. PETERSON, for appellee.

Mr. JUSTICE BOGGS delivered the opinion of the court:

The appellant brought a replevin suit against the sheriff of Cook county to replevin a lot of furs. He executed a replevin bond to the coroner of the county in the sum of $7000, obtained a writ of replevin, by virtue whereof the furs were taken by the coroner and delivered to him. The replevin suit was dismissed, and this an action of debt was instituted in the circuit court of Cook county against the appellant, and one Lehman, as surety, on the replevin bond in the name of the appellee Hertz, the coroner, for the use of James H. Gilbert, the

sheriff of said county, from whose possession the furs
were taken by the coroner. The appellant, among other
pleas to the declaration in the action of debt on the
bond, pleaded that the merits of the controversy as to the
ownership of the furs was not determined in the replevin
suit, and that the title thereto and ownership were in
him. Replications filed to this plea averred that the furs
in question were levied upon by the said sheriff to sat-
isfy certain executions against S. A. Kessler and Isadore
Kolb, co-partners under the name and style of the S. A.
Kessler Fur Company; that said furs were not the prop-
erty of said appellant, but belonged to the S. A. Kessler
Fur Company. Upon the hearing before the court and
the jury, the court instructed the jury that it appeared
from the evidence in the case, as matter of law, that
the said Kessler Fur Company was the owner of the furs,
and that the only question of fact to be determined by
the jury was as to the damages that the plaintiff should
recover. The jury returned a verdict against the appel-
lant in debt in the sum of $7000, (the penalty of the bond,)
to be discharged upon payment of damages assessed at
$2248.93. Judgment was rendered upon this verdict, and
on an appeal prosecuted by the appellant alone, said
Lehman not joining therein, the same was affirmed by
the Appellate Court for the First District, on appeal.
The appellant has prosecuted this his further appeal to
reverse the judgment of affirmance.

In the year 1892 the appellant was an importer and
wholesale dealer in furs in the city of New York, and
had been engaged in that business in that city for some
years prior thereto. The said S. A. Kessler Fur Com-
pany, a co-partnership, was engaged in the business of
manufacturing furs into garments, rugs, etc., and in sell-
ing such manufactured articles and furs at wholesale and
retail, in the city of Chicago. From two to four years
prior to the year 1892 the appellant had sold furs in the
amount of from $200 to $400 per year to the Kessler Fur

Company, on credit. In March, 1892, the fur company was indebted to appellant in a certain sum, for which he held the notes of the company. Appellant regarded the fur company as financially weak. On the 30th day of March, 1892, the appellant addressed to the fur company a letter, to which the fur company replied under date of April 2, 1892. These two letters constitute the contract under which the appellant shipped from New York to Chicago the furs which he subsequently replevied from the sheriff. The circuit court construed these letters to constitute sales of the furs. The contention of the appellant is that the contract evidenced by these letters was a consignment of furs for sale, and that the ownership of the furs remained in him. The letters are as follows:

"No. 92 Gold Street.
WILLIAM H. FLEET, Broker.
Furs, Fancy Skins, Goat Rugs, Robes, etc. Skins Dressed, Mounted and Lined. Cable Address, 'Vasjutly.'

(Dictated.)                    NEW YORK, *March 30, 1892.*

"*S. A. Kessler, Esq.*, *Chicago, Ill.*:

"DEAR SIR—Your favor of the 25th inst. has been duly received, and enclosed check for $160 I passed, with thanks, to your credit, against your note, which annexed I beg to return to you. For remaining 64 cents I beg you kindly to remit to me at next opportunity by mail.

"I cannot fill an order for 100 goat rugs at less than $2.50, and the best goods, dyed black, are $2.75, at which price I am selling thousands of them here. In *fancy color goats* I am not ready yet to offer my new colors. I have large quantities of goods such as the fur manufacturers here are buying, and I have no doubt that I have many bargains for you, and I try to fix matters so that I could ship you a great deal of stuff. Most of these goods, as you know, I am selling for a/c for other people, and as the mercantile agencies do not rate you very high, I cannot sell you the same outright, and guaranteeing to my fellows for the very small commission I get, that would not pay. My desire is to help you all I can do, as I assured you on former occasions. As I am now very anxious to help you, I will do this: I consign to you a $1000 worth of goods, which you agree to handle for my account and hold the proceeds in trust, mak-

ing settlement within 30, 60 or 90 days, as soon as the money may be collected. Now, I am sure that this must be satisfactory to you, and you might send in your orders for the following goods:

*Belgium Coney, red label*, case lots.

| | | |
|---|---|---|
| Assorted 25 x x 50 x x x 25 x x x x | | $2 20 |
| | 25 x x | |
| dto *black label* c lots | 50 x x x | 2 35 |
| | 25 x x x x | |
| | 24 x x | |
| dto blue " " | 50 x x x | 3 50 |
| | 25 x x x x | |
| *Chinchilla Hares*, same as had, | | 5 00 |
| *Silver Rabbits*, medium quality, | | 2 75 |

    *Terms on above goods:* On all money remitted within 30 days, 6% off, 60 days 5% off, 90 days 4% off.

| | | |
|---|---|---|
| *Seal, Copper Island,* | $25 00 and upward. | |
| *Thibet crosses,* | 15 00 | " |
| *Angora Goat,* Turk. skins, | 6 50 | |
| *Cape Angora,* | 3 50 | " |

*Goat Rugs,* $2.50, $2.75 of black.

    (Reefer) Reefer stock.

    "*These later* articles *all net* 30, 60 or 90 days, as you might collect the money. If you want anything else let me know. Now send some orders along. Very truly,

                         WM. H. FLEET."

"S. A. KESSLER, *Supt.*            ISIDORE KOLB, *Manager.*

            S. A. KESSLER FUR CO.

   155 & 157 Washington Street, Opposite Chicago Herald.

         Cash paid for raw furs and fur cuttings.

Telephone No. ———         Removed to 231 Jackson St.

                    CHICAGO, *April 2, 1892.*

    "*Dear Friend Fleet*—Yours of the 30th at hand. Inclosed please find 64c. postage stamps, amount due you on the note. Your proposition of handling your goods on consignment is perfectly satisfactory to us. I am glad you have found a way of doing business with us on safe basis, which I trust will be satisfactory to both. I am only sorry that we had not made these arrangements while I was in your city, for we have used at least $10,000 worth of goods since, and a great many of these goods could have been bought of you, but being in the position we are in at present we had to buy from different houses the goods we had orders on, at terms suitable. I have often thought of writ-

ing to you for certain goods, but I have not had enough nerve to do it, as I thought our limit with you is full. Now, Mr. Fleet, I will try and do business with you satisfactory to you, and will show you that I appreciate your favors in every way. Please send us by U. S. Express following goods: 100 goat rugs, $2.50; 100 doz. Belgium coney, red label, $2.20; 50 astrachan plates, if you have any in stock, at $4.50. We also like to get 50 doz. of J. K. lynx hare at $5.25. A sample of silver rabbits and samples of all light colors goats. If you have tiger cats, please send us all you have dressed, not exceeding 100 skins. Kindly try and keep us posted on everything new that you may get, as we have the trade and can always place it into the market. In regards to money matters, I wish to say to you that all the notes you have of us will be honored promptly, and we shall remit you as fast as we realize from your goods we may order, which shall at no time exceed the terms mentioned in your letter.

"Trusting to see you in your city next month, I remain,

"Yours very truly,

S. A. KESSLER FUR Co.,

pr. S. A. Kessler "

Fleet began shipping goods to Kessler under the arrangement set forth in these letters, the first shipments being on April 6 and 7, 1892, and accompanied by invoices, in all of which the goods are described as consignments. Numerous letters passed between appellant and the fur company between April 2, 1892, and August 18, 1892, on which latter day the fur company failed and was closed up under executions upon judgments confessed by it. The correspondence thus had between the parties, as embodied in their letters to each other, was all introduced in evidence, and is set out in full in the abstract. During the months of April, May, June and July, 1892, and upon the 6th and 9th days of August, 1892, merchandise, aggregating in value a total of $4812.18, was shipped by Fleet to the fur company, and, as is claimed by the appellant, under the arrangement contained in the letters of March 30 and April 2, 1892. On each day when a shipment of goods was made by appellant to the fur company, appellant would send to the fur company an invoice entitled as follows:

"NEW YORK, (giving the date.)
Messrs. S. A. Kessler Fur Co., 231 Jackson St., Chicago, Ill.
    To William H. Fleet, Dr., No. 92 Gold St."

Under the head of "terms" in the first shipment are the following words: "Goods to be sold for my account, proceeds to be held in trust and turned over to me within thirty, sixty or ninety days." With each invoice Fleet would send a receipt to be signed by the fur company, of which the following is a sample:

"CHICAGO, ILL., <em>April 7, 1892.</em>

CONTRACT.

"Received from Wm. H. Fleet, one hundred (100) goat rugs, fifty dozen lynx hares, one hundred (100) dozen coney red l, fifty (50) tiger cats, which we agree to offer and to sell for his account at the net amount of eight hundred and seven 50-100 ($807.50-100) dollars, and remit the same within 30, 60 or 90 days as soon as goods are sold.      S. A. KESSLER FUR Co."

The last shipment of the furs was made on the ninth day of August, 1892. On the 18th day of August of the same year the fur company confessed four judgments in the superior court of Cook county, and the furs so shipped by the appellant to the fur company, remaining unsold, were levied upon by executions issued upon said judgments. The appellant replevied all the furs thus levied on which were in the same condition as when shipped by him to the fur company.

We think the circuit court erred in construing the agreement under which the appellant shipped the furs to the fur company to be a sale of the goods to the fur company. An examination of the two letters which constituted the agreement into which the parties entered, will disclose, among other things, that the fur company did not become indebted in any way to the appellant on the shipment of the furs by the appellant or on the receipt of them by the fur company. The only liability which could arise against the fur company was to a liability to pay to the appellant the amount fixed upon by the appellant as the price to him of the furs when they should

sell the furs and collect the money therefor. The agree-
ment, as shown by the letter of the appellant, authorized
the fur company to sell the furs for cash, or on thirty,
sixty or ninety days' time, in the discretion of the com-
pany, and required the fur company to remit for all sales
as they should collect the money, and as an inducement
to the fur company to make sales for cash or on the short-
est possible time of payment, allowed them a reduction
from the prices fixed by the appellant, of six per cent
on all sums collected and remitted within thirty days,
five per cent upon all sums collected and remitted with-
in sixty days, and four per cent on all sums collected
and remitted within ninety days. The clear intent of the
appellant, as indicated in the letter of March 30, 1892,
is, not to sell any more goods to the fur company, but
to offer to supply the fur company with goods to be sold
by the company as his agent, and to account to him only
for such goods shipped to the company as they should
be able to sell and collect the money for. The express
words of the letter are, that the fur company shall "han-
dle (the furs) for my account and hold the proceeds in
trust, making settlements within thirty, sixty or ninety
days, as soon as the money is collected." Under the terms
of this letter the fur company was authorized to sell the
furs to their customers on terms of credit not exceeding
ninety days, using their best judgment as to the solvency
of such customers, and becoming liable to the appellant
to hold the proceeds of such sales in trust for him and
pay over the same when collected. The intent disclosed
is, not to sell furs to the fur company and to create the
relation of debtor and creditor between the appellant
and the fur company for the furs to be so shipped to them,
but only to place in the possession of the fur company,
as the agent of the appellant, furs to be sold by them
and accounted for only if sold and the money therefor
collected. There is not to be found in the letter any
provision whereby the fur company could, at any time or

in any manner, become the owner of the furs in question. Power in the fur company to sell, as agent, is given, but power to become the owner is not provided for by any of the provisions of the letter. The transaction was not a contract of sale with option to the buyer "to return" the article sold at a fixed time or within a reasonable time, nor a sale with retention of title in the seller until the purchase price should be paid, or an absolute sale. The relation which was created between the appellant and the fur company was not that of vendor and vendee, but of principal and agent.

The appellant could not have successfully maintained an action against the fur company to recover a judgment for the amount of the invoices of goods shipped under the terms and conditions of this letter. He might have maintained an action at law to recover judgment for the amount of any sale of goods made and collected by the fur company and not remitted in accordance with the terms and conditions of the letter. If the furs had been destroyed or damaged while in transit from New York to Chicago the loss would have fallen on the appellant; and the same would have been true if any of the furs had been lost or destroyed while in the possession of the fur company, unless liability to respond for such loss or damage could be predicated upon negligence, or on some ground of recovery not arising out of the terms and conditions of the contract made by the letters. No price was fixed at which the fur company should sell the furs, but a price was fixed at which they should account to the appellant, as principal, for all goods which should be sold and the proceeds of such sale collected by the fur company. The price so fixed was to be "net" to the appellant, which would require the fur company to defray the expense of transporting the furs from New York and of transacting the business in Chicago. The fur company was to look for their compensation to such excess in the price they might be able to obtain over the amount

they were required to account for and pay over to the appellant. The same conditions, in effect, were in the contract involved in *Lenz* v. *Harrison*, 148 Ill. 598, which we construed to be a contract of agency.

The provision in the letter that the fur company shall "hold the proceeds in trust, making settlement in thirty, sixty or ninety days," does not mean the entire amount received on the sale of an article should be held in trust, but only the "proceeds" which, under the contract, should be paid by the fur company to the appellant. The transactions contemplated by this letter were not either absolute or conditional sales of the furs by the appellant to the fur company, or sales with an option to return the goods, but consignments of goods by the appellant to the fur company to be sold for the account of the appellant. The appellant could not, of course, recover furs from a *bona fide* purchaser from the fur company, for he had authorized the company, as his agent, to sell the furs. Property of the principal in the hands of the agent for the purposes of the agency is not subject to levy and sale on an execution against the agent. (11 Am. & Eng. Ency. of Law,—2d ed.—p. 625.) Where the owner, with the intention of sale, has placed the possession in the vendor and clothed the vendor with the *indicia* of ownership, a different rule applies. But in the case at bar there was no intention of sale. Whether the appellant could lawfully recover furs which had been or might be manufactured into garments, rugs, etc., such garments, rugs, etc., not being sold, need not be here discussed, for the articles replevied were such, only, as were in the same condition as when shipped to the fur company.

The fact the fur company did not account for the furs sold as they collected the money therefor, and that the appellant accepted some notes given by customers of the fur company to them in payment for goods other than those furnished by the appellant to be sold, could have no effect to overcome the terms and conditions of the

agreement between the parties and convert the agency into a bargain and sale. The record discloses that the appellant frequently demanded prompt payment of all amounts collected from the sales of his goods, and only accepted the notes referred to because he could not get payments in cash for goods of his which he insisted in his letters in response to which the notes were sent to him, to use his own words, "you must have sold and have the money for it before this, and under these circumstances I want you to remit right away."

A careful reading of the correspondence does not indicate that the appellant or the fur company regarded the transactions between them to be sales of the furs to the company. It is true, that after repeatedly asking for remittances for amounts which he insisted the company must have received from the sales of his goods, and after taking the notes before referred to, and being repeatedly disappointed by the failure of the fur company to make remittances in response to his letters, appellant made a full statement of all the shipments and of the credits and insisted upon settlement, but nothing said indicates that he intended to demand any payment except such as should be due under the terms and conditions of his contract as he construed the contract, viz., that he was entitled to demand the amounts collected on sales made by the fur company.

The contract between the appellant and the fur company was not for the purpose of giving the appellant a lien on the furs to secure the purchase price thereof, for the reason, among others, there was no liability on the part of the fur company to pay anything whatever as purchasers of furs. The appellant did not sell the furs to the fur company, but only supplied them with goods to be sold "on his account," and no debt against the fur company for the furs existed to be secured to him.

We have examined the authorities cited by counsel for the appellee and find none of them at variance with

this view of the case. In *Jennings* v. *Gage*, 13 Ill. 610, speaking of a legal principle here sought to be invoked by the appellee, this court said (p. 614): "This is unquestionably the law where the owners, with the intention of sale, have voluntarily parted with the possession of the goods and clothed the vendee with the *indicia* of ownership, though under such circumstances as would authorize a rescission of the sale and a recovery of the goods as against the vendee." The principle has no application here, for the reason the appellant did not part with the possession of the furs with the intention of selling them absolutely or conditionally to the fur company.

In *Brundage* v. *Camp*, 21 Ill. 329, (to quote from the opinion,) "plaintiff, with the intention of selling, voluntarily parted with the mules on the deceitful promise of Crouch to furnish the note and security," and the decision proceeded to announce the rule of law applicable to the right of a *bona fide* purchaser from a vendee under a conditional sale, or sale with retention of title until the purchase price should be secured. In the case at bar the appellant did not part with the furs with any intent to sell them to the fur company upon any condition whatever.

In *Murch* v. *Wright*, 46 Ill. 487, it was held the transaction between the parties was a sale of a piano, and it was said: "The mere statement of the facts shows this. The price of the piano was $700. The purchaser, on taking it, paid $50, which was called the rent of the piano for the first month, and he was to pay $50 at the beginning of each month thereafter for thirteen months, the piano to become the property of the purchaser in the event of his paying $700 within the thirteen months, and in that event all past payments of rent to count as a part of the $700. It will be observed that at the beginning of the thirteenth month the purchaser would have paid $650, and that he had the whole of that month for the payment of another $50, on the payment of which sum

the piano was to become his property. It was a mere subterfuge to call this transaction a lease." The facts of that case and of the case at bar are not at all similar, for, as we before remarked, the contract evidenced by the letters of the appellant and the fur company did not contain any provision whereby the fur company might, under any circumstances, become the owner of the furs.

In *Lonergan* v. *Stewart*, 55 Ill. 44, the facts were, Lonergan had corn which he wished to sell, but not until better prices could be obtained. One Bradt had a warehouse and was engaged in buying corn. Lonergan put his corn in Bradt's warehouse, and, to quote from the opinion, "expected to get whatever corn would be worth the day he was ready to sell, and expected to sell it to Bradt, and have his money any day he called and demanded it, at the price of that day; did not expect to get the corn again, but expected the money for it;" that Bradt "did not agree to pay the money on any given day, but at any time when he, witness, fixed the price; he was to get the market price of the day he should fix; there was no understanding what was to be done in case they failed to pay the money when he fixed the day." He was paid $20 in money by Bradt and received a barrel of salt from him, and brought an attachment suit against Bradt, and in his affidavit he stated that Bradt was indebted to him in the sum of $438 for the price of corn. That this transaction was declared to be a sale can have no influence to direct the action of the court in the case at bar.

In *Michigan Central Railroad Co.* v. *Phillips*, 60 Ill. 190, chattels were sold under conditions which, as between the vendor and vendee, would leave the title in the vendor until the purchase price was paid though the possession passed to the vendee, and the holding was that a *bona fide* purchaser of the chattels from the vendee would acquire good title to them. There, there was a sale, a delivery of the property sold, a price fixed which the

purchaser was to pay, and an effort to retain the title in the vendor to secure the purchase price without taking a chattel mortgage.   A vendor cannot in Illinois, as against a *bona fide* purchaser, retain the title to chattels which he has sold and delivered, as a means of securing payment of the purchase money.  But that principle does not operate to prevent the owner of chattels from placing them in the hands of an agent, commission merchant or factor, to be sold on his account, without making his property subject to be levied upon and sold to satisfy executions against such agent, commission merchant or factor.

*VanDuzor* v. *Allen,* 90 Ill. 499, is but another of the many cases in which it has been held that the vendor of chattels who has delivered the possession of the chattels to the purchaser cannot, by force of any contract to that effect, retain the title to the property to secure the indebtedness due him from the purchaser, as against the rights and interests of third persons.

In *House* v. *Beak,* 141 Ill. 290, we said (p. 300):  "Under the proofs in this case the goods in question were not consigned to the defendants to be sold by the latter as agents of the plaintiffs, but the agreement between the parties was what is known as a contract 'on sale or return.'  *  *  *  Under the circumstances we think the defendants failed to exercise their option [to return the goods] within a reasonable time, and are liable as upon an absolute sale."   The contract in the case at bar does not vest property in the furs in the fur company and create a liability in the fur company to pay for them, with an option to return them at a fixed time, or within a reasonable time, and be acquitted of liability to pay a purchase price, and is not a contract "on sale or return."

In *Chickering* v. *Bastress,* 130 Ill. 206, the question arose whether an agreement entered into between Chickering & Sons, of New York City, and Pelton, Pomeroy & Cross, of Chicago, should be construed to be a sale of the pianos

mentioned in the contract to Pelton, Pomeroy & Cross, or a consignment of the instruments to said firm to be sold by them as agents of Chickering & Sons. The agreement, though in form a consignment of goods for sale, was held to be but a device to disguise the real transaction, which was a sale. A feature of that case sufficient, within itself, to distinguish the case from the one at bar and mark that transaction as a sale, was that Pelton, Pomeroy & Cross were, on the receipt of each invoice of pianos, to execute and deliver their negotiable promissory notes for the amount of such invoice to said Chickering & Sons. The agreement denominated these promissory notes "advances" made by Pelton, Pomeroy & Cross to said Chickering & Sons, and provided: "All advances that may be made by said consignees (Pelton, Pomeroy & Cross) to said consignors (Chickering & Sons) by negotiable paper shall be credited on and for the particular piano or pianos they were made upon, but only when such negotiable paper shall have been paid, and not before, and such advances, until paid in full, shall transfer no title to said consignees." This provision in the agreement demonstrated that the transaction was a sale of the pianos to Pelton & Co., and that the declaration of the agreement that Pelton & Co. held the pianos as agents was but a subterfuge, by which it was designed to secure to Chickering & Sons a lien on the pianos, to secure the payment of the notes they held against Pelton & Co. In the opinion in that case it was said (p. 215): "It is indisputable that, under the contract in question, Pelton & Co. were vested with the power and right of discharging themselves from any further obligations as respected all the pianos mentioned in any one invoice, by paying to the Chickerings the negotiable promissory note given therefor, but which, for the purpose of disguising the real nature of the contract, is therein called an 'advance.'" In *Lenz* v. *Harrison*, 148 Ill. 598, this provision of the contract in the Chickering-Bastress agreement was said to

be a "marked distinction" between that agreement and the one then under consideration, which was there held to be a consignment of chattels for sale, and not a sale.

In the case at bar the fur company executed no promissory notes for the furs sent to them, and became in no manner indebted to the appellant by reason of the shipment of any invoice of such articles to them. The agreement between the appellant and the fur company, according to the terms and conditions of the letters between them, does not differ in any material respect from innumerable ordinary contracts of agency entered into between principals and their agents, factors or commission merchants. In *Peoria Manf. Co.* v. *Lyons,* 153 Ill. 427, there was present the same feature which was of such prominent and controlling influence in *Chickering* v. *Bastress, supra.* It was that Weaver & Treadway, who it was contended were but agents or consignees, executed and delivered their promissory notes to the manufacturing company, who it was insisted was but a consignor, for the price of the goods, as shown by bills rendered to the alleged consignee by the alleged consignor. In *Chickering* v. *Bastress, supra,* and in *Peoria Manf. Co.* v. *Lyons, supra,* the instruments to be construed created the relation of debtor and creditor between the parties, and indicated unmistakably that the transactions were sales of the property, and that the purpose and intent of the parties in executing the instruments were to secure the payment of the indebtedness created by the purchase of the articles without complying with and in violation of the provisions of our statutes regarding the mode and manner of creating liens upon chattel property as against the rights and interests of third persons. The case at bar is unlike either of these cases in the chief distinction to be looked for in determining whether a transaction is a consignment of goods of the principal to an agent for sale for the account of the principal, or whether it is a sale and the instrument but a subterfuge to conceal the

201—39

true nature of the transaction, which is, that in the case
at bar the relation of debtor and creditor did not arise
because of the transfer of the possession of the property
from the appellant to the fur company, and that such
relation was created by the change in possession of the
property in each of the other cases.

In *Lenz* v. *Harrison,* 148 Ill. 598, the written agreement
which was there involved was in all of its material re-
spects not different from the contract involved in the
case at bar. In that case one Harrison, who resided at
Grand Rapids, Michigan, and one Harrington, residing
at Henry, in the State of Illinois, entered into an agree-
ment which in its first clause appointed the party of the
second part, Harrington, to act as the agent of Harrison,
party of the first part, in the sale of wagons, which were
to be shipped by Harrison from Grand Rapids to Har-
rington, at Henry, Illinois. By the contract Harrington
accepted the agency, and agreed to the following condi-
tions, viz.: "Will pay freight charges, local and general
taxes on the wagons, have them properly housed and
under cover, and will make good any loss or damage by
fire; will pay all expenses whatever; will sell to no per-
son or firm on credit whatever, except such as is of
undoubted solvency and financially responsible, and on
all time sales which shall not exceed twelve months will
take notes on blanks as enclosed, with interest at the
rate of seven per cent per annum from the date of sale;
will endorse all notes, guaranteeing their prompt pay-
ment when and where due; will so conduct the business
that the time of final payment in Grand Rapids shall
not exceed twelve months from date of shipment; will
transmit to the office of the party of the first part the
proceeds of each cash sale, or part cash sale, on the day
the sale is made or by first mail thereafter; and further,
on the last day of every month will make out an account
of sales for the current month, and transmit the same,
together with all notes, to the office of the party of the

first part, and at any time after twelve months from date of shipment, to give his own note for balance of consignment unpaid, on four months, with interest at seven per cent from date last above named, if so required by party of the first part. But nothing herein shall be construed as amounting to a positive sale without said requirements, and that during the continuance of this contract they will sell no wagon other than ........ Third, it is further understood and agreed that the party of the first part will invoice all wagons to the party of the second part at the prices specified on the back of this agreement, and that on final settlement of each consignment all sums over and above such specified prices for which the party of the second part may sell the wagons shall be allowed to the party of the second part as full commission and other charges, more especially enumerated in clause 2 of this agreement." It was held the relation created by this agreement was that of principal and agent and not vendor and vendee. We there said (p. 603): "There is no similarity between this case and cases where there is a conditional sale or sales made, with a provision in the contract that the title to the property shall not pass until paid for by the vendee. The rule, therefore, established in *Murch* v. *Wright*, 46 Ill. 487, and other cases of like import, does not apply here: The contract is not a mortgage, nor is it an instrument in the nature of a mortgage. Harrington was not indebted to Harrison. There was no debt to be secured, and in the absence of a debt it is not perceived what object the parties could have in making a mortgage.   *   *   *   Harrington did not agree to purchase the property, nor did Harrison agree to sell to him. The price of the wagons was specified on the back of the contract, and Harrington was clothed with authority to sell, and retain as his commission whatever sum he might receive over the specified price. The commission over the specified price was the interest, and the only interest, Harrington had in the property, and

whether that would amount to anything depended entirely upon the success he might meet with in making sales. Harrington never gave a note or any other obligation agreeing to pay for the wagons, and by the terms of the contract there was no provision under which he could at any time become the owner of the property. * * * *Chickering* v. *Bastress*, 130 Ill. 206, has been cited as an authority that the transaction is a sale. There are several features of the contract involved similar to the contract in the case cited. But there is one marked distinction between that case and this one. There notes were given on receipt of the goods, and upon the payment of a note given for any one invoice the consignees were relieved of all further liability as respected that consignment, and the title to the property would vest. The contract in this case contains no such provision."

The case at bar and that presented to the court in *Lenz* v. *Harrison*, *supra*, are not different in any controlling aspect. The circuit court erred in the construction given to the letters which constitute the contract between the appellant and the fur company.

A question not touched upon may again arise upon a re-trial of the cause, and must therefore be determined. The affidavit, writ and bond in the replevin suit became lost prior to the dismissal of that cause in the circuit court. The appellant notified the court that such files were lost, and asked leave to substitute true copies of the affidavit, writ and bond, to be received in lieu of the originals. Leave was granted and the appellant filed copies, and these copies stood as the originals in that court. The copy of the bond so filed by the appellant was produced in evidence on the hearing of the case at bar. He cannot be permitted to complain that the court, in the case at bar, received and treated the copy as competent evidence against him. The surety on the bond has not joined in this appeal and does not object to the action of the court.

Jurisdiction to entertain suits on lost instruments under seal have been entertained by equity courts from an early day. Jurisdiction in equity attached because it was the doctrine of the common law that an action at law could not be maintained on a lost bond, because there could be no profert of the lost instrument, without which the declaration would be defective. Section 19 of the Practice act rendered it unnecessary to make profert of the instrument sued upon, and though a court of equity may still exercise the jurisdiction assumed by those courts while profert was necessary in an action at law, still the effect of the statute was to remove every obstacle to the prosecution of such suits in courts of law.

The judgment of the Appellate Court and that of the circuit court are each reversed, and the cause will be remanded to the circuit court for further proceedings in conformity with this opinion.    *Reversed and remanded.*

Mr. CHIEF JUSTICE MAGRUDER, dissenting:

I do not concur in this decision, or in the reasoning of the opinion, for the following reasons:

The main contention made by the appellant relates to the character of the arrangement, embodied in the letters of March 30, 1892, and April 2, 1892.

The appellant claims, that the transaction between Fleet and the S. A. Kessler Fur Company was a consignment, and not a sale, and that, therefore, the title to the goods remained in Fleet, so as to justify his replevin of them. On the other hand, it is claimed by appellee, representing the creditors of the fur company, and prosecuting this action in their interest, that the transaction between Fleet and the fur company was a sale, and not a consignment, and that the title to the goods was thereafter vested in the execution debtor at the time they were taken upon execution by the sheriff. The material question in the case, therefore, growing out of the instruc-

tions given by the court, is whether the arrangement in question was a consignment, or a sale.

Whether the arrangement between Fleet and the fur company was a contract of bailment, or an arrangement for the sale of goods under the device of a consignment for sale, is a question of law to be determined by the court upon a construction of the letters of March 30, 1892, and April 2, 1892, giving due weight to all the provisions thereof with the view of finding out what was the real intention of the parties. (*Chickering* v. *Bastress*, 130 Ill. 206; *Graham* v. *Sadlier*, 165 id. 95).

The correspondence, which took place between Fleet and the fur company after the arrangement was entered into, and the course of business, as conducted between them in the shipment of the goods and in the sending of statements and invoices, are acts on their part, indicating the construction placed by themselves upon the written agreement embodied in the original letters. (*Street* v. *Chicago Wharfing Co.* 157 Ill. 605; *Hall* v. *First Nat. Bank of Emporia*, 133 id. 234; 1 Beach on Modern Law of Contracts, sec. 721).

In determining the meaning of the agreement from the language used in it, and from the acts of the parties done under it, it is to be remembered that the policy of the law in Illinois does not permit the owner of personal property to sell it either absolutely or conditionally, and still continue in the possession of it. Possession is one of the strongest evidences of title to this class of property. In *Hervey* v. *Rhode Island Locomotive Works*, 93 U. S. 664, the Supreme Court of the United States, speaking through Mr. Justice Davis, said: "The courts of Illinois say that to suffer without notice to the world the real ownership to be in one person, and the ostensible ownership in another, gives a false credit to the latter, and in this way works an injury to third persons. * * * Secret liens, which treat the vendor of personal property, who has delivered the possession of it to the purchaser,

as the owner until the payment of the purchase money, cannot be maintained in Illinois. They are held to be constructively fraudulent as to creditors, and the property, so far as their rights are concerned, is considered as belonging to the purchaser holding the possession." In *Harkness* v. *Russell*, 118 U. S. 678, the Supreme Court of the United States again said, speaking through Mr. Justice Bradley: "The law has been held differently in Illinois, and very nearly in conformity with the English decisions under the operation of the Bankrupt law. The doctrine of the Supreme Court of that State is, that, if a person agrees to sell to another a chattel on condition that the price shall be paid within a certain time, retaining the title in himself in the meantime, and delivers the chattel to the vendee so as to clothe him with the apparent ownership, a *bona fide* purchaser, or an execution creditor of the latter, is entitled to protection as against the claim of the original vendor."

It is also to be noted that, if the real purpose of the agreement is to cover up a sale and preserve a lien in the vendor for the price of the goods, it makes no difference that the transaction is called, or is designated upon its face, a consignment for sale. (*Ex parte White*, L. R. 6 Ch. App. 400; *Chickering* v. *Bastress, supra; Hervey* v. *Rhode Island Locomotive Works, supra*). In the latter case it is said: "In determining the real character of a contract, courts will always look to its purpose, rather than to the name given to it by the parties." (See also *Jennings* v. *Gage,* 13 Ill. 610; *Brundage* v. *Camp,* 21 id. 329; *Murch* v. *Wright,* 46 id. 487; *Lonergan* v. *Stewart,* 55 id. 44; *Michigan Central Railroad Co.* v. *Phillips,* 60 id. 190; *Lucas* v. *Campbell,* 88 id. 447; *Latham* v. *Sumner,* 89 id. 233; *VanDuzor* v. *Allen,* 90 id. 499; *House* v. *Beak,* 141 id. 290).

If the arrangement between appellant and the fur company be examined in the light of the principles thus announced, it cannot be construed otherwise than as a scheme for the sale of goods upon credit by Fleet to the

fur company. The designation of the transaction as a consignment of goods to be sold was merely a device to cover up its real character.

Before March 30, 1892, the fur company had been engaged in the manufacture of furs in Chicago, and Fleet had sold them goods upon credit. The fur company had become his debtor for goods so sold, and had executed notes to him, which he held against them at that time. All this is shown upon the face of the letter of March 30, 1892. It also appears upon the face of that letter, that Fleet was unwilling any longer to continue the mode of doing business, which had theretofore existed between them. He tells Kessler of the fur company in that letter, that the mercantile agencies do not rate the fur company "very high." It was his own opinion, that the sale of goods to the fur company was a risky business in view of the fact that its financial standing was not good. He, therefore, says that he will try to fix matters, so that he can ship the company "a great deal of stuff." The new arrangement, which he proposes to make, grows out of the fact stated by him, that he "cannot sell you the same (goods) outright." The new arrangement was based upon the consideration, that the fur company was weak financially, and that it was not safe to sell them goods "outright." The plain inference is, that the matter should be so fixed, as to sell them goods, but so as not to make the sales thereof "outright." The same circumstances, which exist in the case at bar, existed in the case of *Chickering* v. *Bastress, supra,* namely, that there had been previous business transactions between the parties making the consignment arrangement, and that, in the conduct of such previous business, the relation of seller and purchaser had existed between them. Here, it is evident that the new arrangement was merely for the purpose of avoiding the risks, which were likely to grow out of such relation of seller and purchaser.

By the terms of the letter of March 30, 1892, Fleet was to consign to the fur company goods, "which you agree to handle for my account and hold the proceeds in trust, making settlement within 30, 60 or 90 days, as soon as the money may be collected." He then tells Kessler that he is sure that this will be satisfactory to him, and requests him to send in his order for certain goods. He proposes that, as to some of these goods, the terms shall be, "on all money remitted within 30 days, 6% off, 60 days, 5% off, 90 days, 4% off." As to other goods mentioned, and whose prices are fixed, he says, "These later articles all net, 30, 60 or 90 days, as you might collect the money." It is to be observed that the company is not to hold the goods shipped in trust for Fleet, but only the proceeds. Settlement is to be made by the company with Fleet within thirty, sixty or ninety days "as soon as the money may be collected." This does not mean, as is claimed by counsel for appellant, that the fur company is to sell the goods upon a credit of thirty, sixty or ninety days, but it means that the fur company, as between itself and Fleet, is to have a credit of thirty, sixty or ninety days, and shall remit the money, or make settlement, within thirty days if the money is collected within thirty days, or sixty days if collected within sixty days, or ninety days if collected within ninety days. The discount, which is to be allowed on all money remitted, is a discount to be allowed the fur company, and not a discount to be allowed to the purchasers from the fur company. In the letter of March 30, 1892, and in the letter of April 2, 1892, no provision of any kind is made, indicating that the relation of vendor and vendee is to exist between Fleet and the purchasers from the fur company. The fur company is to take the goods from Fleet at the prices fixed in the invoices or statements of shipment, accompanying the letters, which passed between the parties. There is no direction in the original letters constituting the con-

tract, or in any of the letters subsequently written by Fleet, which fixes the prices at which the fur company is to sell the goods, or which fixes any terms or conditions, upon which the fur company is to dispose of the goods. It is left to the fur company itself to sell the goods upon whatever terms it chooses to fix. There is no provision in the contract, or in the letters embodying the contract, which imposes any obligation upon the fur company to return any of the goods shipped to them in case of failure to sell within thirty, sixty or ninety days, or any other time. The features thus alluded to have been commented upon in many cases, as indicating that the intention of the parties to the arrangement made was to constitute between themselves the relation of vendor and purchaser, and not that merely of consignor and consignee for the purpose of sale by the latter for the former. There is no provision made in the contract as to the party who shall bear the expenses of the shipments and sales, such as freight, storage and insurance. On the contrary, it appears that all of these expenses were to be borne by the fur company, and not by Fleet. It is furthermore to be noted that no provision is made in the contract for the compensation to be received by the fur company for selling Fleet's goods, if they were to sell such goods as his agents. Nothing is said therein about commissions upon the sales. There is no provision, that the fur company is to retain all of the proceeds of the sales to be made by them, over and above the prices fixed in the invoices or statements sent with the letters.

The features of this transaction, which have been thus mentioned, have been found to exist in many transactions declared by the courts to constitute sales, and not consignments. In *Chickering* v. *Bastress, supra,* it was said that the agreement there under consideration was not a contract of bailment, and that the provisions authorizing the purchasers, or alleged consignees, "to determine solely for themselves at what prices they would sell the

pianos from their store, is almost conclusive that in reality they were not acting as the agents or factors of the Chickerings; but that, with the further provision that they were to bear as their proper burden all the expenses of shipment, etc., the same, precisely, as purchasers, would leave no doubt that the contract was not one of bailment, or of principal and factor."

In *Lonergan* v. *Stewart, supra*, this court, speaking through the late Justice BREESE, said: "When the identical thing delivered is to be restored, though in an altered form, the contract is one of bailment, and the title to the property is not changed, but when there is no obligation to restore the specific article, and the receiver is at liberty to return another thing of equal value, he becomes a debtor to make the return, and the title to the property is changed—it is a sale." This same language is used in *Chickering* v. *Bastress, supra*, with the addition of the words, "or the money value," after the words, "another thing of equal value." In *Lonergan* v. *Stewart, supra*, where it was held that there was a sale of the corn in controversy in that case, it was said by the court: "It was well understood by the parties to it, and it was their intention that the identical corn was not to be returned, but that it was to be shipped and sold by Bradt in the usual course of his business. This being so, Bradt became the owner of the corn, as all the authorities hold." (See also *Ex parte White, supra; Richardson* v. *Olmstead*, 74 Ill. 213; *Sturm* v. *Boker*, 150 U. S. 329). In the case at bar, there is nothing in the letters, expressed in explicit terms, or that can reasonably be implied, which permits Fleet to demand a return of the goods invoiced, or gives the fur company the right to return the same in case of a failure to sell the same. On the contrary, the letters are full of requests to the fur company to forward money in payment of its account. This money, when forwarded, was applied upon general account, and not in payment of any particular lot of furs shipped at any one time.

The contract, embodied in the letters, nowhere requires the fur company to render any account of sales. All of the goods, which were sold, appear to have been sold in the name of the fur company, and not in the name of Fleet, or of the fur company as the agent of Fleet. No sign was put up by the fur company at their store in Chicago, indicating that they were acting as agents for Fleet in the sale of any of the latter's goods. The proof shows that the fur company was engaged in the manufacture of the goods shipped to them by the appellant. Upon all the letter-heads used by the fur company in their correspondence with the appellant, they used the words, "cash paid for raw furs and fur cuttings," showing that the goods purchased by them were used in their own business of manufacturing, rather than for the purpose of making sales to third persons.

After repeated requests for the remission of money by Fleet, the fur company, in a letter written to Fleet on May 28, 1892, sent him two notes aggregating $447.75. These notes were received by the fur company from their customers in payment of goods sold by the company, which were not received from the appellant, but from other parties than the appellant. These notes did not represent the proceeds of the sales of goods shipped to the fur company by Fleet, but they were the proceeds of the sales of goods with which Fleet had nothing to do. In the correspondence Fleet is continually referring to the indebtedness, which exists from the fur company to him, although he knew at the time that the goods, representing such indebtedness were still in the possession of the fur company, and had not yet been sold by them. In a letter written to Fleet on August 4, 1892, the fur company tells Fleet that it has in its possession "over $3000.00 worth of your goods on hand this day; all the hares, thibets, angoras and leopards cats *bought of you* are stock keepers, and they may not move for the next two months to come. * * * Now, Fleet, old boy, you need

not worry for the *amount of money due you*, as we have sufficient, two dollars for every one we owe." This letter not only refers to over $3000.00 worth of goods as having been bought by the fur company of Fleet, but it refers to money due from the company to him. Knowing, as Fleet must have known, that the company had $3000.00 worth of his goods in their possession still unsold, he wrote to them in August, 1892, as follows: "You must send along a check for $400.00 to $500.00 as I must get some money out of this business with you. *Already you owe me over* $3000.00." It is impossible to believe that the fur company were merely agents of Fleet to sell his goods, if they owed him for $3000.00 worth of goods which he had shipped to them, and which they still had in their possession, and which they had not yet sold. All the statements and invoices, which accompanied the letters, were prefaced at the top of each letter, above the description of the goods shipped, and their prices, with the following words: "S. A. Kessler Fur Co. to William H. Fleet, Dr.," thus designating the fur company as the debtor of Fleet.

The mere fact, that, by the terms of the arrangement, as embodied in the letters, the fur company was to make settlements, or remit money, within thirty, sixty or ninety days "as soon as the money may be collected," or "as soon as goods are sold," does not necessarily imply a consignment, instead of a sale. The wholesale merchant, who ships goods to the retail merchant, expects the retail merchant to sell the goods to his customers, and out of the proceeds of such sales to pay the wholesale merchant. Indeed, the retail merchant relies upon his business in making sales to realize the money to pay for the goods which he procures at wholesale. The mere fact, that the fur company was within a certain time to pay for the goods, shipped to it by Fleet, out of sales which it might make, is not a conclusive indication that they were receiving the goods upon consignment for sale, rather than as purchasers.

In several cases decided by this court, the fact, that the alleged consignee of goods was required by the contract to execute to the consignor notes for the purchase price of the goods so shipped, was held to indicate that the transaction was a sale, and not a consignment, upon the ground that the execution of such notes made the consignee a debtor directly to the consignor for the invoice price of the goods. (*Chickering* v. *Bastress, supra; Lenz* v. *Harrison,* 148 Ill. 598; *Peoria Manf. Co.* v. *Lyons,* 153 id. 427). There is no difference between such cases and the case at bar, because, here, the fur company was to remit money, or make settlement, with the appellant every thirty, sixty or ninety days without any provision as to the return of the goods to the appellant in case of failure to sell the same within the time so limited. No notes of any kind were to be taken from the purchasers, to whom the fur company should sell goods, either payable to the order of Fleet, or to the order of the fur company as agent of Fleet. As Fleet was not to determine the terms of the sales to be made by the fur company, nor receive anything whatever, directly or indirectly, from the parties, to whom the fur company should make sales, as evidencing purchases of his goods by them, no relation of seller and purchaser was to exist or could exist between Fleet and the purchasers from the fur company. The conclusion is inevitable, therefore, that, in case of failure to sell the goods within the time limited by the contract, and in the absence of any provision for their return, the fur company was to remain the debtor of the appellant, the same as though it had executed its notes to the appellant. (*Ex parte White,* L. R. 6 Ch. App. 400).

After a careful consideration of the case, and of all the authorities referred to by counsel, I am of the opinion that the transaction here, under consideration was a sale, and not a consignment, and that the lower courts decided correctly in so holding and that their judgments ought to be affirmed.