### BRIGGS v. FOSTER et al.

#### (Circuit Court of Appeals, Eighth Circuit. April 19, 1905.)

#### No. 2,107.

DECEIT—CORPORATE STOCK—SALE—REPRESENTATION OF AGENTS.

Where defendants, being in absolute control of a mining corporation, through three of its directors, contracted with another corporation for the sale of a large number of shares of stock held by defendants at the price of 30 cents per share, with the privilege of retaining all that the sellers secured above such price as their commission, and the sellers paid 3 cents of every 30 cents received for a share of the stock to the corporation and the other 27 cents to defendants, the sellers were mere agents for the defendants, who were therefore liable for fraudulent representations made by such sellers in prospecti issued to induce the purchase of such stock.

In Error to the Circuit Court of the United States for the District of Nebraska.

H. C. Brome (A. H. Burnett, A. G. Ellick, and H. B. Shoemaker, on the brief), for plaintiff in error.

F. H. Gaines (E. G. McGilton and John A. Storey, on the brief), for defendants in error.

Before SANBORN, Circuit Judge, and PHILIPS and RINER, District Judges.

RINER, District Judge. This was an action brought by Joseph E. Briggs against Albert C. Foster and John B. Carmichael to recover the sum of $3,600 damages, together with interest thereon, which the plaintiff alleges he suffered by reason of certain false

representations made by the defendants, through their agent, whereby he was induced to purchase stock of the International Zinc Company, Limited, between the 1st of January and the 1st of August, 1900.

It is alleged in the petition that in the month of November, 1899, the defendants, Foster and Carmichael, held options for the purchase and lease of certain mining property located near the city of Joplin, in the state of Missouri, known as "The Blue Wing," "The Mayne," and "The Free Coinage"; that defendants had contracted to purchase the fee respecting a portion of the properties and outstanding leases upon the balance thereof for the sum of $163,688.88; that these mining properties at that date, as defendants well knew, were worth less than $40,000; that, having acquired this option, the defendants, Foster and Carmichael, conceived the idea of organizing a corporation to take over and acquire the mining properties above described, and by means of the sale of the stock of such corporation "secure for themselves a large sum of money on account and for the said operations," and to accomplish this purpose, on the 20th of November, 1899, entered into an agreement with one A. C. Hartwell, by the terms of which it was provided that Hartwell should organize a company under the laws of West Virginia to be known as the "Colonial Zinc Company, Ltd.," the name being subsequently changed to "International Zinc Company, Ltd.," which should have a capital stock of $1,000,000, divided into 1,000,000 shares of the par value of $1 each, and should have a board of directors consisting of five persons, three of whom should be selected by the defendants, Foster and Carmichael, and two should be selected by Hartwell; and that it was further agreed that the defendants should sell and convey the mining properties above referred to to the corporation, the deeds and releases for the same to be placed in escrow in the Joplin National Bank of Joplin, Mo., to be held until payments provided therein should have been made. It is then alleged that it was further agreed that upon the organization of the corporation the defendants and Hartwell should meet, and secure the selection of a board of directors and the officers of the company, and should issue and deliver all of the stock of the corporation to the defendants, Foster and Carmichael; that after the issuance of the stock to the defendants they should deposit the same with the Knickerbocker Trust Company of New York; that it was further agreed that Hartwell should pay the defendants the sum of $10,000, and should receive in lieu thereof 33,333 shares of the capital stock of the corporation; that it was further agreed prospectuses should be issued by the corporation at the expense of Hartwell, and the stock should be sold to persons who might be induced to purchase the same; that the corporation was formed as provided in the contract; that the defendants, Foster and Carmichael, D. K. Wenrich, Charles P. Bennett, and Ira B. Cushing were selected as directors; that the defendant Foster was made president and the defendant Carmichael secretary and treasurer of the corporation; that the only persons who were members of the board of directors present at the meeting were Foster, Car-

michael, and Wenrich; that the defendants, as officers and directors of the corporation, forthwith caused 999,500 shares of the capital stock of the corporation to be issued and delivered to them, the remaining 500 shares being issued to certain persons, who, at the instance and request of defendants, and by prior arrangement between the defendants and Hartwell, in contemplation of the making of the contract, they had caused and procured to adopt articles of incorporation and subscribed 500 shares of stock preliminary to and as a part of the scheme for the organization of the corporation under the laws of the state of West Virginia; that the defendants, for the purpose of procuring the sale of stock of the corporation, caused and procured the contract with Hartwell to be assigned to Joshua Brown & Co., a corporation organized under the laws of the state of West Virginia, and doing business in New York, Philadelphia, and Boston; that thereupon the defendants, as officers and directors of the International Zinc Company, Limited, authorized Joshua Brown & Co. to act for and on behalf of the corporation as its fiscal agent, and to carry out on behalf of and for the defendants, in accordance with the terms of their contract with Hartwell, contracts for the sale of shares of stock of the company, and to prepare, issue, and circulate among the public prospectuses for the purpose of inducing third persons to purchase shares of stock; that thereupon the defendants, Foster and Carmichael, as officers and directors of the International Zinc Company, Limited, acting through said Joshua Brown & Co., prepared, issued, and circulated numerous copies of three distinct and separate prospectuses; that all of said prospectuses contained numerous representations of fact which were well known to the defendants, Foster and Carmichael, to be false and untrue, and to have been made for the purpose and with the intent to deceive third persons among whom said prospectuses were circulated, and thereby induce such third persons to purchase shares of stock; that copies of the prospectuses were sent to the plaintiff; and that, believing and relying upon the representations contained in the several prospectuses to be true, he was induced thereby and did purchase at different times shares of stock of the International Zinc Company, Limited, at the rate of 75 cents per share to the amount of $3,600. It is further alleged in the petition that on December 15, 1899, January 18, 1900, and February 19, 1900, dividends of 1 per cent. were declared on all of the outstanding stock of the International Zinc Company, Limited, and at all of the times when dividends were declared there were no profits out of which dividends could be paid; that the dividends, as declared and paid to the stockholders, were paid out of the proceeds from the sale of stock; that the defendants, Foster and Carmichael, well knew at the time the dividends were declared that no profits had been earned by the company out of which dividends were to be paid, and that they knowingly, willfully, and fraudulently declared the dividends with the intent to pay the same out of the proceeds derived from the sale of stock, and for the purpose of deceiving the then holders of stock of the corporation, and thereby induce them to make additional purchases of shares.

The contract, attached to the petition as an exhibit, contains the following provisions:

"The parties of the first part further agree that they will give to the party of the second part an option to purchase all of the remaining shares of the capital stock of the said company at the price of thirty cents per share to them, net; in the manner following:

"Sixty-seven thousand, six hundred and sixty-seven (67,667) shares at the net price of thirty cents per share to the parties of the first part to be paid for by the party of the second part on or before thirty days from the date of transferring the property unto the Colonial Zinc Co., Limited.

"One hundred thousand (100,000) shares at the net price of thirty cents per share to the parties of the first part to be paid for by the party of the second part on or before sixty days from the date of transferring the properties herein mentioned to the Colonial Zinc Co., Limited.

"One hundred thousand (100,000) shares at the net price of thirty cents per share to the parties of the first part to be paid for by the party of the second part on or before ninety days from the date of transferring the properties herein mentioned to the Colonial Zinc Co., Limited.

"One hundred and fifty thousand (150,000) shares at the net price of thirty cents per share to the parties of the first part to be paid for by the party of the second part on or before four months from the date of transferring the properties herein mentioned to the Colonial Zinc Co., Limited.

"One hundred and fifty thousand (150,000) shares at the net price of thirty cents per share to the parties of the first part to be paid for by the party of the second part on or before five months from the date of transferring the properties herein mentioned to the Colonial Zinc Co., Limited.

"Two hundred thousand (200,000) shares at the net price of thirty cents per share to the parties of the first part to be paid for by the party of the second part on or before six months from the date of transferring the property herein mentioned to the Colonial Zinc Co., Limited.

"Two hundred thousand (200,000) shares at the net price of thirty cents per share to the parties of the first part to be paid for by the party of the second part on or before seven months from the date of transferring the property herein mentioned to the Colonial Zinc Co., Limited.

"In the event of the party of the second part failing to purchase or sell the amount of stock mentioned within the time hereinbefore set forth, then this contract may at the option of the parties of the first part be terminated and the stock withdrawn from sale; and the party of the first part shall not be held liable for any of the conditions named in this written contract. * * *

"It is agreed by the parties of the first part that they will donate ten thousand (10,000) shares Colonial Zinc Co., Limited, as consideration for the two directors, to serve in that capacity, said directors to be nominated and satisfactory to the party of the second part. This stock, however, with the exception of one hundred (100) shares for each director, to be pooled with the balance of the stock and to be sold for their benefit pro rata with the other stock, if the directors desire it, otherwise they may retain the same and sell when desired, but no stock is to be sold except through the party of the second part.

"It is further agreed by the parties of the first part that the nine hundred and ninety-nine thousand, five hundred (999,500) shares received as full payment for the property, they will donate to the treasury of the company one hundred thousand (100,000) shares, the proceeds from the sale of this treasury stock to be devoted to acquiring new properties and the erection of new mills and developing the mines.

"All the stock of this company is to be deposited with the Knickerbocker Trust Company of New York, with instructions to deliver the same to the party of the second part upon the payment of thirty cents per share, and for every ten (10) shares sold, one share (1) to be a share of treasury stock and the proceeds to go to the benefit of the treasury."

The defendants filed an answer, admitted the citizenship of the parties as set forth in the petition, and denied each and every other

allegation of the petition. The case came on for trial before the court and a jury, resulting in a verdict in favor of the defendants.

At the close of the evidence the court was requested to instruct the jury to return a verdict for the plaintiff, submitting to the jury only the question of the amount of damages. This request was denied, and the ruling of the court thereon duly excepted to, and is now assigned for error.

While there is a conflict of evidence in relation to some of the transactions of the parties, we think it is clearly established by the evidence: That the defendants desired to exploit these mines, form a corporation, and place its stock upon the market. That this is true is shown by the contract itself, which commenced with the recital, "Whereas, it is deemed advisable to exploit said property by organizing a company to take over such property." That to effect this purpose, they entered into a contract with Hartwell, who was acting for Joshua Brown & Co., and to whom he afterwards assigned the contract. That the corporation was formed and the stock issued as provided in the contract. That Joshua Brown & Co. prepared circulars or prospectuses, and furnished copies thereof to the plaintiff, and that the statements contained in these circulars or prospectuses were materially false. That dividends were declared and paid, as alleged in the petition, when none were earned. That, instead of paying these dividends out of the earnings, they were paid out of money realized from the sale of stock. That the plaintiff relied upon the representations contained in the prospectuses, and was thereby induced to purchase stock. That the stock was utterly worthless. That the shares of stock were issued in blank, and delivered to the Knickerbocker Trust Company under the contract with Joshua Brown & Co. That Joshua Brown & Co. sold a large portion of them, and for every share which they sold they paid to the defendants not 30 cents, but 27 cents per share, under the pooling clause of the contract, or as Mr. Foster, in his testimony, puts it: "All of the stock that was sold was sold to Joshua Brown & Company or Hartwell at twenty-seven cents a share net to us. It was sold at thirty cents, but twenty-seven cents went to us." That the provision of the contract, requiring deeds in fee simple and leases with full covenants of warranty and bills of sale conveying the property free from all debts and liens to be deposited by the defendants with the Joplin National Bank, and then gave to Joshua Brown & Co. an option to purchase 67,667 shares within 30 days, 100,000 shares within 60 days, 100,000 shares within 90 days, 150,000 shares within 4 months, 150,000 shares within 5 months, 200,000 shares within 6 months, and 200,000 shares within 7 months after the deeds were deposited, was never performed. That the defendants never made the deeds, so that the time never arrived when Joshua Brown & Co. was required to exercise the option. That Joshua Brown & Co. never purchased the amount of stock specified in the contract, but, on the contrary, it sold all of the stock it ever disposed of under the pooling clause of the contract, whereby 3 cents out of the proceeds of every 30 cents was the

property of the company, and 27 cents, as testified by Mr. Foster, went to the defendants. That the defendants did not pay for the property to the vendors as they had agreed, but, on the contrary, in August they made another agreement with Joshua Brown & Co., whereby they conveyed to the International Zinc Company, Limited, the Free Coinage mine, subject to a mortgage for $29,550, and turned back to the company $115,000 of its own stock, instead of paying cash for the property, and turned over the property subject to the mortgage for $29,550; all in violation of the provisions of the contract of November 20, 1899.

The foregoing facts being, as we think, fully established by the evidence, we are of the opinion that the defendants were liable for the representations of Joshua Brown & Co., without reference to the question of their own moral guilt or innocence. This contract must be read and interpreted by a consideration of all of its provisions, and its obvious design is not to be controlled by the precise force of single words. Union Stockyards & Transit Co. et al. v. Western Land & Cattle Co., 59 Fed. 53, 7 C. C. A. 660. And when so read it constitutes, as we think, an agency contract pure and simple. It is nothing more than an agreement with Joshua Brown & Co. to be the agent of defendants and the International Zinc Company, Limited, of which the defendants had absolute control through the three directors, to sell 967,000 shares of stock, share and share alike, at the price of 30 cents per share, with the privilege of retaining all that they secured above 30 cents as their commission. Even if the contract is to be construed as a contract offering two options (a construction of which, in our judgment, it is not susceptible), it is, we think, clear that Joshua Brown & Co. accepted the second, sold the stock as agents of the pool, and accounted for it as such. The evidence is undisputed, and Mr. Foster himself testified that Joshua Brown & Co. paid 3 cents of every 30 cents they received for a share to the company and 27 cents to the defendants, Foster and Carmichael.

The second option required the stock of the defendants and the stock of the company to be pooled, sold together, and the proceeds divided pro rata. Joshua Brown & Co. had no option to purchase the stock of the company, but sold the stock of the company and of the defendants, without separation, together, pooled the proceeds, and paid the defendants their pro rata, 27 cents, and paid to the International Zinc Company, Limited, its pro rata, 3 cents, upon every share sold.

But, as already indicated, we think the contract before us is a contract of agency. A contract which empowers an agent to sell personal property at any price he may see fit, and to pay the owners a fixed price when sold, and to retain the balance as his commission, is, under facts and circumstances, such as are disclosed by this record, an agency contract, and not a sale conditional or otherwise. The money to be paid by Joshua Brown & Co. was not to be paid upon a sale of the stock to that company, but upon a sale of the stock by that company. In other words, it was to account

for the proceeds of the sale of the stock as fixed by the contract. There is wanting an essential element of a sale, an agreement to pay a price. Joshua Brown & Co. took upon itself no obligation of this character. It assumed no debt to the defendants or the International Zinc Company, Limited, Barnes Safe & Lock Co. v. Bloch Bros. Tobacco Co., 38 W. Va. 158, 18 S. E. 482, 22 L. R. A. 850, 45 Am. St. Rep. 846; Met. Bank v. Benedict, 74 Fed. 182, 20 C. C. A. 377; Lenz v. Harrison (Ill.) 36 N. E. 567; Monitor Mfg. Co. v. Jones (Wis.) 72 N. W. 44. In Re Galt, 120 Fed. 64, 56 C. C. A. 470, where the contract provided that the second party thereto should account for 60 per cent. of the list prices of goods sold, and would pay cash or give his notes for the goods on hand at the expiration of 12 months, if required by the first party, it was held that the contract was a contract of agency, and not of sale. Weir Plow Co. v. Porter, 82 Mo. 23; Ferd Heim v. Linck, 51 Mo. App. 478. And a contract that the second party might sell, that he should pay a fixed price in Farmer's notes or cash, that he should guaranty the notes, that the goods should be invoiced to him as bought, that the first party had the option to require the second party to pay the stipulated prices of those remaining at the end of the season, was held to constitute the second party an agent, and not a purchaser (Williams Mower & Reaper Co. v. Raynor, 38 Wis. 119); and this was the legal effect of the contract with Joshua Brown & Co.

In the contract under consideration Joshua Brown & Co. had the power to sell, but the property and proceeds of it, to the extent of the fixed price, was the property of the International Zinc Company, Limited, and the defendants, for which Joshua Brown & Co. would have been liable for embezzlement if they had not accounted. Williams Mower & Reaper Co. v. Raynor, 38 Wis. 119; Holleman v. Fertilizer Co. (Ga.) 32 S. E. 83; Nat. Bank of Augusta v. Goodyear (Ga.) 16 S. E. 972; Fleet v. Hertz (Ill.) 66 N. E. 858; Brown v. Billington, 163 Pa. 76, 29 Atl. 904, 43 Am. St. Rep. 780; McCullough v. Porter, 4 Watts & S. 177, 39 Am. Dec. 68; Hunt v. Wyman, 100 Mass. 198; Sturm v. Boker, 150 U. S. 329, 14 Sup. Ct. 99, 37 L. Ed. 1093.

Upon the facts established by the evidence in this case, our conclusion is that the plaintiff was entitled to recover, and the jury should have been so instructed.

The judgment of the Circuit Court must be reversed, and cause remanded, with directions to grant a new trial.