## CHARLES F. CHICKERING *et al.*

### *v.*

### JULIUS BASTRESS *et al.*

*Filed at Ottawa October 31, 1889.*

1. CONTRACT—*whether a sale, or a mere bailment.* Where the identical thing delivered is to be restored in the same or an altered form, the contract is one of bailment; but when there is no obligation to restore the specific article, and the person receiving it is at liberty to return another thing of equal value, he becomes a debtor to make a return, and the title to the property is changed—it is a sale.

2. LAW AND FACT—*construction of a contract—and its fraudulent purpose.* Whether a written agreement between parties constitutes a contract of bailment of goods, or was designed to cover a sale on which the vendor's lien might be preserved, is a question of law. But the question of actual fraud or intent to defraud creditors is one of fact, to be submitted to the jury.

3. FRAUDULENT TRANSFER OF GOODS—*reserving a secret lien in favor of the vendor.* Whatever the form of an agreement may be, if its purpose be to cover up a sale and reserve a secret lien in the vendor, it is void as respects creditors of the vendor, whether the credit was given before or after the delivery of the goods. A consignment for such purpose is no better than any other device.

4. Where one party, by means of contract, but without notice to the world, suffers the real ownership of chattels to be in himself, and the ostensible ownership to be in another, the law will postpone the rights of the former to those of the execution or attachment creditors of the latter, because to injure third persons by giving a false credit to such ostensible owner is the natural and probable result of the transaction.

5. A entered into a written contract with B & C, whereby A was to ship pianos to B & C, and in which it was provided: First, that the prices at which B & C were to take the goods were to be agreed upon and expressed in the invoices; second, they were to pay all freight charges and cost of shipment, and keep the pianos insured for the benefit of A; third, B & C were at liberty to sell the pianos at such prices as they might fix upon them, and have all they could get above the invoice price, in full for charges, commissions, expenses, etc.; fourth, advances might be made by B & C by negotiable paper, and when such paper was paid, it should transfer the title to the particular pianos for which such paper was given; and fifth, all pianos delivered by A to B & C were subject to the order of the former, and their right

to transfer, remove, sell or repossess themselves of the same at any time without notice: *Held*, that while the form of the agreement was that of a consignment for sale, its real purpose was to cover up a sale and preserve a lien in favor of A.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. JOHN P. ALTGELD, Judge, presiding.

This is an action of replevin to recover the possession of 17 pianos, valued in the affidavit for the writ at $6000.00. The action was brought in the Superior Court of Cook County on February 7, 1883, by the appellants, composing the firm of Chickering & Sons of New York City, against the appellees Julius Bastress of Chicago, and Seth F. Hanchett Sheriff of Cook County, and also against Alonzo Pelton, Andrew J. Pomeroy and Richard W. Cross, composing the firm of Pelton, Pomeroy & Cross of Chicago. Bastress and Hanchett filed pleas of *non cepit*, *non detinet*, and property in Pelton, Pomeroy & Cross. Hanchett also filed a special plea, setting up levy upon the pianos, as property of Pelton, Pomeroy & Cross, under an execution issued upon a judgment for $10,252.00 rendered by said Superior Court in favor of Bastress against Pelton, Pomeroy & Cross, etc. Upon the first trial of the case the verdict and judgment were in favor of the plaintiffs. Upon appeal to the Appellate Court the judgment was reversed and the cause was remanded as will appear from the case of *Bastress* v. *Chickering*, 18 Bradw. 198. The second trial resulted in favor of the defendants, and the judgment has been affirmed by the Appellate Court whence it is brought here by appeal.

The facts will appear from the following statement which precedes the opinion of the Appellate Court in *Bastress* v. *Chickering, supra*:

"It appears that Chickering & Sons, plaintiffs below, had, for a long time prior to the transaction in question, been manufacturers, in the city of New York, of pianos known by their name; that for some two years prior to October 14, 1882,

Pelton, Pomeroy & Cross had been carrying on a general music store in Chicago in their own names, as owners, and had been accustomed to buy for said business musical instruments, etc., from other parties as well as from plaintiffs; that said house in Chicago had been of long standing before Cross became a partner, did a large business, and had a good reputation, financially and otherwise, but that, in fact, the firm had become financially embarrassed prior to October 14, 1882, and had borrowed large sums of money from one Tainter, for which he held the firm's judgment note for $41,000; that the execution creditor, Bastress, was ignorant of that fact, and from time to time, after as well as before that date, lent to said firm sums of money, so that February 6, 1883, the amount borrowed of him amounted to $10,252. The evidence tends to show that Cross put no capital into the firm, and that for some reason he was zealously interested in behalf of Chickering & Sons; that he, without the concurrence of either Pelton or Pomeroy, but co-operating with the Chickerings, prepared for execution the following agreement, which was in fact executed October 14, 1882, but antedated as of August 31, 1882, Cross signing it for his firm. It was signed in duplicate, and is as follows:

"'This agreement, entered into this 31st day of August, 1882, between the co-partnership of Chickering & Sons, of New York City, parties of the first part, and the co-partnership of Pelton, Pomeroy & Cross, of the city of Chicago, parties of the second part:

"'*Witnesseth:* The parties of the first part, at the request of the parties of the second part, agree to forward and deliver on consignment to the parties of the second part, all pianos of the manufacture of the parties of the first part that the last named parties may determine that the parties of the second part may need in their business in Chicago, at rates and prices to be agreed upon and specified in the invoices of pianos forwarded as aforesaid, said pianos to remain the exclusive

property of the parties of the first part, and to be sold for them and on their account by the parties of the second part. And the parties of the second part agree to pay all freight charges and costs of shipment of pianos so consigned to them, and also keep them fully insured for the parties of the first part, and pay all insurance premiums thereon, and to accept and receive said pianos only on consignment, as aforesaid, and sell and dispose of them only for and on account of the parties of the first part. And it is agreed that the parties of the second part, as compensation, and in full for all charges, commissions, expenses, compensations, and claims of every nature against the parties of the first part, by reason of such consignments, shall have all moneys received by the parties of the second part for the parties of the first part for the sale of such pianos, over and above the prices at which such pianos shall have been consigned; and all moneys so received by the parties of the second part shall be regularly remitted to the parties of the first part, less the sums the parties of the second part are entitled to retain under this agreement; and the moneys so remitted shall be credited and allowed in payment and discharge for the particular piano or pianos the same was received by the parties of the second part in payment for. All advances that may be made by said consignees to said consignors by negotiable paper, shall be credited on and for the particular piano or pianos they were made upon, but only when such negotiable paper shall have been paid, and not before, and such advances, until paid in full, shall transfer no title to said consignees. All pianos consigned, as aforesaid, shall be subject to the order of the parties of the first part, and their right to transfer, remove, sell or re-possess themselves of the same at any time and without notice. The parties of the first part shall have the right to fix, at any time or in any case, the amount of advance to be made by the parties of the second part by negotiable paper, on consignments, and to fix the time of such negotiable paper, and may end this agreement at any time.'

14—130 Ill.

"It appears from the evidence, that although Pelton, Pomeroy & Cross were from time to time borrowing money from Bastress after said agreement was made, yet he was kept ignorant of its existence.   It also appears, that for two years prior to that agreement the plaintiffs had been selling and delivering pianos to Pelton & Co. on credit, the usage being for the latter firm to give the former notes covering the aggregate prices of those delivered during the month, at the end thereof, and that among those so sold and delivered were two which were in the store of Pelton & Co. at the time of the agreement, and were among those replevied.   There was nothing to indicate any change in the manner or character of the business of Pelton & Co. after the said agreement, which the plaintiffs and Cross kept secret, except that the word 'consigned' was written across each invoice of pianos shipped. All of said invoices, under which those in question were delivered, except as to number and prices, were as follows :

" 'The following conditions are agreed to as a statement of the relative positions and rights of Chickering & Sons and their agents :   The 'agents' of this firm are its customers who are engaged in selling its pianos in the territory allotted to them.   Such customers are not 'agents' in any sense known to the law, having no authority to bind said Chickering & Sons, or to incur liability on their account.   The Messrs. Chickering & Sons will take care of their own warranties of pianos whenever requested, by making repairs, or authorizing them to be made, if justly chargeable.   'Agents' are not at liberty to make or procure repairs at the expense of Chickering & Sons without permission.   The agency may be terminated at any time by either party, unless a written contract exists.   It is agreed. that the pianos specified in this bill are bought and sold upon the conditions herein set forth.

*To Chickering & Sons, Dr.*'          PELTON, POMEROY & CROSS.

"Then followed the pianos, with style and number and price, in the usual form of a bill of goods sold, but across was written the word 'consigned.'

"The evidence tended to show, that at the end of each month Pelton, Pomeroy & Cross made and sent their promissory notes, to Chickering & Sons for all the pianos received by the former of the latter during the month, and accompanied by said form of invoice, the same as had been done prior to said agreement, and that they had paid, in cash, $1000. The evidence tended to show, that Pelton, Pomeroy & Cross were in failing circumstances in January, 1883; that an agent of Chickering & Sons then came to Chicago, and Cross went through the form of turning over to said agent the pianos in question, but the latter left them in the possession of Pelton, Pomeroy & Cross, the same as they had previously been; that on the morning of February 7, 1883, the same form was repeated, but there was no visible change of possession, and they were then and there taken upon the execution aforesaid, in favor of Bastress; that said agreement, which was in fact made October 14, 1882, was dated as of August 31, 1882, so as to cover pianos which had been sold and delivered by Chickering & Sons to Pelton, Pomeroy & Cross, and were in the possession of the latter, as purchasers, at the time said agreement was made, and so remained thereafter. There was evidence tending to show, and sufficient to go to the jury, that said agreement was in fact made with the intent on the part of the parties making it, to hinder, delay and defraud the creditors of said Pelton, Pomeroy & Cross, by conferring upon said firm the *indicia* of ownership of the pianos, and thereby give them a false credit, while Chickering & Sons should retain to themselves a secret lien thereon, whereby they could, in case of danger from the creditors, through said agreement and the friendliness of Cross, keep the other creditors at bay."

Messrs. LYMAN & JACKSON, and Mr. ALLAN C. STORY, for the appellants:

The consignment contract was valid between the parties and as to creditors, and no title could pass to the pianos consigned until they were sold to third parties, or had been paid for by Pelton, Pomeroy & Cross. *Gray* v. *Agnew,* 95 Ill. 317; *Rankin* v. *Shepardson,* 89 id. 445; *Barton* v. *Coryea,* 40 id. 321; *Alexander* v. *Tomlinson,* 40 Ark. 216; *Printing Press Co.* v. *Lowell,* 60 Cal. 454; *Walker* v. *Butterick,* 105 Mass. 237.

Goods held by a factor are not liable to execution for his debts. Wharton's Com. on Agency, sec. 757; *Horn* v. *Baker,* 9 East, 245; *Looke* v. *Hollingsworth,* 5 L. R. 226.

The fact that Pelton, Pomeroy & Cross were to receive as their commissions all moneys received over a certain price, does not affect the fact of their agency. *Mower and Reaper Co.* v. *Raynor,* 38 Wis. 119; *Rees* v. *Spruance,* 45 Ill. 308.

The contract expressly provided that the pianos should be subject to the order of appellants, and a right to transfer, remove, sell or re-possess themselves of the same at any time, and without notice. Under this contract, the rights of creditors of Pelton, Pomeroy & Cross could not attach. *Foster* v. *Smith,* 56 Ill. 211; *Fairbanks* v. *Malloy,* 16 Bradw. 282; *Cannabel* v. *Lynch,* 45 Iowa, 85; *Alexander* v. *Tomlinson,* 40 Ark. 216; *Pam* v. *Wilmar,* 54 How. Pr. 285.

On the part of appellants there was nothing secret in connection with the contract in question, or the business done in connection with the consignment account. The invoices accompanying each shipment contained notice of the consignment. *Gray* v. *Agnew,* 95 Ill. 319; *Fairbanks* v. *Malloy,* 11 How. 209; *Insurance Co.* v. *Kiger,* 103 U. S. 352; *Alexander* v. *Tomlinson,* 40 Ark. 216; *Chicago Taylor P. P. Co.* v. *Lowell,* 60 Cal. 454; *Ballard* v. *Bergot,* 40 N. Y. 314; *Coville* v. *Hill,* 4 Denio, 323; *McNeal* v. *Tenth Nat. Bank,* 46 N. Y. 325; *McCreary* v. *Gaines,* 55 Texas, 485; *Thompson* v. *Borman,* 49 Iowa, 392; Story on Agency, p. 325, sec. 113.

Mr. H. W. Magee, for the appellees :

No mortgage, trust deed, or other conveyance of personal property having the effect of a mortgage or a lien upon such property, shall be valid, as against the rights and interests of any third person, unless possession thereof shall be delivered to and remain with the grantee, and the instrument is acknowledged and recorded as directed by the statute ; and every such instrument shall, for the purpose of the act, be deemed a chattel mortgage. Rev. Stat. chap. 95, sec. 1.

An unrecorded agreement between parties, whereby the title to personal property remains in one, while the possession and all the *indicia* of ownership, with the right of sale, is given to another, whereby others are induced to give credit, is void in the State of Illinois, as against *bona fide* creditors, and amounts to a sale as far as they are concerned, and the property covered would be subject to levy by an execution creditor. See *Thornton* v. *Davenport,* 1 Scam. 296 ; *Kitchell* v. *Bratton,* 1 id. 300 ; *Morris* v. *Grover,* 2 id. 528 ; *Rhines* v. *Phelps,* 3 Gilm. 464 ; *Jennings* v. *Gage,* 13 Ill. 614 ; *Reed* v. *Eames,* 19 id. 596 ; *Thompson* v. *Yeck,* 21 id. 74 ; *Brundage* v. *Camp,* 21 id. 330 ; *Read* v. *Wilson,* 22 id. 377 ; *Ketchum* v. *Watson,* 24 id. 591 ; *Bay* v. *Cook,* 31 id. 336 ; *Brownell* v. *Dixon,* 37 id. 197 ; *Bell* v. *Farrar,* 41 id. 404 ; *McCormick* v. *Hadden,* 37 id. 371 ; *Butters* v. *Haughwout,* 42 id. 29 ; *Lonergan* v. *Stewart,* 55 id. 44 ; *Murch* v. *Wright,* 46 id. 488 ; *Railroad Co.* v. *Phillips,* 60 id. 190 ; *Railroad Co.* v. *Wagner,* 65 id. 197 ; *Young* v. *Bradley,* 68 id. 553 ; *Ticknor* v. *McClelland,* 84 id. 474 ; *Allen* v. *Carr,* 85 id. 388 ; *Lucas* v. *Campbell,* 88 id. 449 ; *Sibley* v. *Tie,* 88 id. 287 ; *Latham* v. *Sumner,* 89 id. 233 ; *Van Duzor* v. *Allen,* 90 id. 499 ; *Roger* v. *Williams,* 92 id. 189 ; *Doane* v. *Lockwood,* 115 id. 490 ; *Martin* v. *Wirts,* 11 Bradw. 572 ; *Denny* v. *Mead,* 90 Ill. 379 ; *Bastress* v. *Chickering,* 18 Bradw. 198.

The law on this subject, as held in Illinois, has been affirmed and adopted by the United States Supreme Court. *Hervey* v. *Locomotive Works,* 93 U. S. 671 ; *Heryford* v. *Davis,* 102 id. 243.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

All the questions of fact involved in the case, including the question whether or not there was actual fraud on the part of the Chickerings and Cross, in entering into the agreement in question, were properly submitted to the jury under the instructions which were given, and are settled, so far as we are concerned, by the judgment of the Appellate Court.

The main question, which arises upon exceptions to the giving and refusal of instructions in the case, relates to the proper construction to be given to the agreement between Chickering & Sons and Pelton, Pomeroy & Cross. Upon this subject we concur in the following views, expressed by the late Justice McAllister, in delivering the opinion of the Appellate Court:

"But the question as to what was the real object or purpose of the parties to that agreement,—whether it was designed to cover a sale of the pianos from the Chickerings to Pelton, Pomeroy & Cross, and under the label or device of a consignment for sale to preserve in the vendors a lien upon the goods, or whether it constituted a contract of bailment,—were questions to be determined by the court upon a construction of the instrument, fairly considering all its provisions, with the view of finding therefrom what was the real intention of the parties. Those, undoubtedly, are pure questions of law. *Murch* v. *Wright*, 46 Ill. 487; *Hervey* v. *Rhode Island L. Works*, 93 U. S. 664; *Heryford* v. *Davis*, 102 id. 235; *Fish* v. *Benedict*, 74 N. Y. 613.

"As pertinent to those questions, we may briefly state that the contract provides: 1. That the prices at which Pelton, Pomeroy & Cross were to take the pianos of the Chickerings were to be agreed upon and expressed in the invoices. 2. Pelton & Co. were to pay out of their own pockets all freight charges and costs of shipment, to keep them insured for the benefit of the Chickerings, the former paying the premiums. 3. Pelton & Co. were at liberty to sell the pianos at such prices

as they chose to fix upon them, and to have all they could get over and above the invoice prices, in full for all charges, commissions, expenses, etc. When they sold one or more they were to remit the invoice price to the Chickerings, and that should be in payment and discharge for the pianos so sold. 4. Advances might be made by Pelton & Co. by negotiable paper, and when such paper was paid it should transfer the title to the particular pianos for which such paper was given. 5. All pianos delivered by the Chickerings to Pelton & Co. were subject to the order of the former, and their right to transfer, remove, sell or re-possess themselves of the same, at any time, without notice.

"The last clause we regard as in the nature of the insecurity clause usually inserted in chattel mortgages. Is this a contract of bailment? It is well settled in this State, that when the identical thing delivered is to be restored in the same or an altered form, the contract is one of bailment, and the title to the property is not changed; but when there is no obligation to restore the *specific* article, and the receiver is at liberty to return another thing of equal value, or the money value, he becomes a debtor to make a return, and the title to the property is changed—it is a sale. (*Lonergan* v. *Stewart*, 55 Ill. 49, and authorities there cited; *Richardson* v. *Olmstead*, 74 id. 213.) Sir William Jones, in his work on Bailments, (2d ed.) 102, says: 'It may also be proper to mention the distinction between an obligation to restore the specific things, and a power or necessity of returning others equal in value. In the first case it is regular bailment; in the second it becomes a debt.'

"It is indisputable, that, under the contract in question, Pelton & Co. were vested with the power and right of discharging themselves from any further obligations, as respected all the pianos mentioned in any one invoice, by paying to the Chickerings the negotiable promissory note given therefor, but which, for the purpose of disguising the real nature of the contract, is therein called an 'advance.' In our opinion, it was not a

contract of bailment, and the provisions authorizing Pelton & Co. to determine solely for themselves at what prices they would sell the pianos from their store, is almost conclusive that in reality they were not acting as the agents or factors of the Chickerings; but that, with the further provision that they were to bear as their proper burden all the expenses of shipment, etc., the same, precisely, as purchasers, would leave no doubt that the contract was not one of bailment, or of principal and factor.

"The form of the agreement was that of consignment for sale, but its real purpose was to cover up a sale and preserve a lien in the Chickerings for the price of the pianos. The invoices used are in perfect harmony with this view. They contained conditions which were to be considered as agreed to, and one of them was: 'The agents of this firm (Chickering & Sons) are its customers who are engaged in selling its pianos in the territory allotted to them. Such customers are not agents in any sense known to the law,' etc. Then follows: 'It is agreed that the pianos specified in this bill are bought and sold upon the conditions herein set forth.' It is true that the word 'consigned' was written across the bill, but there is no magic in that word which can take from the transaction its real character.

"In *Thompson* v. *Pratt*, 94 Pa. St. 275, the court says: 'Whatever the form of the agreement, if its purpose was to cover up a sale and preserve a lien in the vendors for the price of the goods, it was void as respects creditors, whether the credit was given before or after the delivery of the goods. A consignment for such objects is no better than any other device.' The same view was taken in *Murch* v. *Wright, supra,* where the device was a pretended lease. So, also, in *Hervey* v. *Rhode Island Locomotive Works, supra.* The cases cited are authority for the doctrine, that where one party, by means of contract, but without notice to the world, suffers the real ownership of chattels to be in himself, and the ostensible ownership

to be in another, the law will postpone the rights of the former to those of the execution or attachment creditors of the latter, because, to injure third persons by giving a false credit to such ostensible owners, is the natural and probable result of the transaction. *Rose* v. *Story*, 1 Barr, 190; *Martin* v. *Mathiot*, 14 Serg. & R. 214; *Stadtfeld* v. *Huntsman*, 92 Pa. St. 53; *Brunswick* v. *Hoover*, 10 Weekly Notes of Cases, 219.

"We are of opinion that the agreement in question was void, as respects Bastress, the execution creditor, and the sheriff, for the reasons just stated."

The views thus expressed are not inconsistent with those presented in the case of *Gray* v. *Agnew*, 95 Ill. 315, referred to by counsel for appellants. In the latter case, the opinion of the Court proceeded upon the assumption that there was a consignment of goods, and that the fact of such consignment was not denied by either party. Here, however, the question is whether a contract in writing can be properly construed to be a contract for the consignment of goods, or a contract for the sale of goods.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*