In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1377

IN RE:

MISSISSIPPI VALLEY LIVESTOCK, INC.,

*Debtor.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 12-C-50341 — **Frederick J. Kapala**, *Judge.*

ARGUED SEPTEMBER 30, 2013 — DECIDED MARCH 12, 2014

Before WOOD, *Chief Judge,* and BAUER and KANNE, *Circuit Judges.*

WOOD, *Chief Judge.* This case calls on us to enter the world of commercial livestock operations. In happier times, Mississippi Valley Livestock was in the business of buying and selling fatted livestock for slaughter and processing. Mississippi Valley had an arrangement with J&R Farms (J&R) under which the former agreed to sell some of J&R's cattle to a particular buyer. Shortly before declaring bankruptcy, Mississippi Valley paid J&R nearly $900,000 representing completed sales. The bankruptcy trustee now seeks to recover those funds under the preferential-transfer provi-

sion of the Bankruptcy Code, 11 U.S.C. § 547(b). The trustee's efforts were unsuccessful in both the bankruptcy court and the district court. Although we have no quarrel with much of what those courts did, we conclude that further proceedings are necessary, because it is unclear how much of the money could properly be traced to a constructive trust in favor of J&R.

**I**

Beginning in early January 2007, Mississippi Valley agreed to sell cattle to Swift Con-Agra (Swift). It planned to fulfill that agreement in part with cattle it had received from J&R and in part with cattle from other suppliers. Importantly, Mississippi Valley was merely the holder of J&R's cattle, rather than the purchaser or owner. Because the relationship between Swift and J&R had soured, Mississippi Valley chose not to inform Swift that some of the cattle it was delivering to Swift were actually J&R's. The unwitting Swift paid for these purchases with checks made out to Mississippi Valley. Mississippi Valley deposited the checks in its own general operating account, and then from time to time, it sent J&R checks representing the proceeds of the sales of the latter's cattle.

This arrangement worked well until Mississippi Valley stopped making timely remittances to J&R. As the debts accumulated, J&R sent Mississippi Valley increasingly frantic demands for payment. In one handwritten letter dated March 6, 2007, J&R proprietor Ron Lahr listed 14 head of cattle for which J&R had not yet been paid. "I still have not received my money," complained Lahr. "I think it has been long enough. I don't want to hear <u>excuses</u>. … I know you have all this money, I want it[.] Fed Ex or wire to me tomor-

row. This is getting old, the lies and waiting for it. You are just using it." Lahr's pleas did not fall on deaf ears. Over the next month, Mississippi Valley sent seven checks to J&R totaling $862,747.31.

Less than 90 days later, on May 25, 2007, several creditors filed an involuntary petition for relief against Mississippi Valley under Chapter 7 of the Bankruptcy Code. Acting as Mississippi Valley's bankruptcy trustee, Stephen Balsley (the Trustee) sought to avoid the seven payments to J&R as preferential transfers. The parties agreed that the transfers met all the requirements of a preference, if the transferred funds constituted "an interest of the debtor in property." See 11 U.S.C. § 547(b). But J&R insisted that Mississippi Valley never had the requisite property interest in the funds.

J&R argued that Mississippi Valley held the cattle-sale proceeds for J&R's benefit—in effect, in trust. Because the proceeds were held in trust, J&R said, they were never part of Mississippi Valley's estate and therefore the payments did not satisfy the definition of an avoidable preference. The Trustee took the position that Mississippi Valley's estate did have an interest because the funds were commingled with Mississippi Valley's general operating account, rather than segregated into a separate account. This meant, the Trustee argued, that payments drawn from that account were indeed avoidable as preferences.

The bankruptcy court granted summary judgment in J&R's favor, and the district court affirmed. "Because the uncontested facts in this case show that Mississippi Valley only held the property as bailee for J&R," the district court concluded, "Mississippi Valley had no equitable or legal interest in the property." Therefore, the court determined, the pay-

ments were not a transfer of an interest of the debtor in property. The court did not analyze the propriety of imposing a constructive trust on the funds in J&R's favor, nor did it trace the payments to the proceeds derived from sales of J&R's cattle. The Trustee timely appealed the judgment to this court.

**II**

Like the district court, we review a bankruptcy court's factual findings for clear error and its legal conclusions *de novo*. *In re Davis*, 638 F.3d 549, 553 (7th Cir. 2011). The decision whether to grant summary judgment is a legal conclusion. *In re Midway Airlines, Inc.*, 383 F.3d 663, 668 (7th Cir. 2004).

This appeal turns on the question whether Mississippi Valley's payments to J&R were a "transfer of an interest of the debtor in property." See 11 U.S.C. § 547(b). We begin with a closer look at the terms under which Mississippi Valley held J&R's cattle. We then address two additional questions: first, whether it is possible to impose a constructive trust for bankruptcy purposes; and second, whether the payments made here can be traced to the proceeds of the sales of J&R's cattle.

1.  Bailment

J&R contends that Mississippi Valley held its cattle in bailment. Because property interests in bankruptcy are "created and defined by state law," see *Butner v. United States*, 440 U.S. 48, 55 (1979), we look to the law of Illinois, which the parties agree governs in this case, to see if bailment is the proper characterization of the arrangement.

Under Illinois law, "bailment is 'the delivery of goods for some purpose, upon a contract, express or implied, that after the purpose has been fulfilled [the goods] shall be redelivered to the bailor, or otherwise dealt with according to his directions, or kept till he reclaims them.'" *Kirby v. Chi. City Bank & Trust Co.*, 403 N.E.2d 720, 723 (Ill. App. Ct. 1980) (quoting *Knapp, Stout & Co. v. McCaffrey*, 52 N.E. 898 (Ill. 1899)); see also *Berglund v. Roosevelt Univ.*, 310 N.E.2d 773, 775 (Ill. App. Ct. 1974) ("Bailment is defined as the rightful possession of goods by one who is not an owner."). Although bailment takes many forms, the "characteristics common to every bailment are the intent to create a bailment, delivery of possession of the bailed items, and the acceptance of the items by the bailee." *Id.* at 775–76.

Intent to create a bailment may be shown by "either an express agreement … or an agreement by implication, which may be gathered from the circumstances surrounding the transaction, such as the benefits to be received by the parties, their intentions, the kind of property involved, and the opportunities of each to exercise control over the property." *Wall v. Airport Parking Co. of Chi.*, 244 N.E.2d 190, 192–93 (Ill. 1969). Historically, Illinois courts have found bailment in cases in which the alleged bailee took possession of goods to be sold for the bailor's benefit. See *Wolf & Son v. Shannon*, 50 Ill.App. 396, 402 (Ill. App. Ct. 1893) ("[T]hese cattle [were placed] in the custody of Strahorn & Co., to be sold for the benefit of Wolf & Son … . Strahorn & Co, by receiving the cattle with such knowledge and direction, became bailees, holding the cattle for the use of Wolf & Son.").

Illinois courts distinguish bailments from conditional sales, which create only an ordinary debtor-creditor relation-

ship. See *Chickering v. Bastress*, 22 N.E. 542, 543 (Ill. 1889) ("[W]hen the identical thing is to be restored in the same or an altered form, the contract is one of bailment … but when there is no obligation to restore the specific article, and the receiver is at liberty to return another thing of equal value, or the money value … it is a sale."); see also *People v. Moses*, 31 N.E.2d 585, 587 (Ill. 1940) (bailment exists when goods are "disposed of in some particular manner as directed or agreed upon for [the owner's] benefit").

In distinguishing bailment from sale, the key question is whether "the sender [has] the right to compel a return of the thing sent, or has the receiver the option to pay for the thing in money?" *In re Galt*, 120 F. 64, 68 (7th Cir. 1903) (applying Illinois law). Compare *Chickering*, 22 N.E. at 543 (finding sale where recipients "were vested with the power and right of discharging themselves from any further obligations … by paying" for goods), with *Lenz v. Harrison*, 36 N.E. 567, 568–69 (Ill. 1893) (finding bailment where contract contained "no provision under which [sales agent] could at any time become the owner of the property").

Over a century ago, our court (applying Illinois law) decided a case similar to this one: *In re Galt.* Galt sold wagons on behalf of the Mitchell and Lewis Company. Under the parties' agreement, Galt neither owned nor had an option to buy the wagons. The agreement required Galt to keep the wagons until they were sold, and then to remit cash received for them by draft payable to the Company. He was allowed to keep any funds obtained in excess of the Company's price. At any time prior to sale, the Company could compel Galt to return the wagons in his possession, because the Company was the owner until sale. When Galt filed for bankruptcy, the

trustee took control of the wagons in Galt's possession in order to sell them for the benefit of Galt's creditors. We found that the arrangement between Galt and the Company was a bailment. This meant that the wagons had to be returned to the Company and could not be sold to satisfy Galt's debts. *Galt*, 120 F. at 68–69.

More recently, an Illinois court applied the distinction between bailment and sales in *Nassar v. Smith*, 315 N.E.2d 692 (Ill. App. Ct. 1974). In *Nassar*, two different parties—Nassar and Bralock—separately delivered tires to another person, Walden. A third party then seized all the tires in Walden's possession in execution of a judgment debt against Walden. The court found that Walden had the authority to sell Nassar's tires if he paid the cost to Nassar. Therefore, it concluded that the transaction between Nassar and Walden was a sale. In contrast, Walden held Bralock's tires only for the purpose of whitewalling them, after which the tires were to be returned to Bralock. According to the court, this relationship presented a "classic form[] of bailment." Based on this distinction, the court concluded that Nassar's tires could be sold to satisfy Walden's debt, but Bralock's had to be returned to Bralock. *Id.* at 694–96.

Applying these principles, we conclude that a bailment existed between J&R and Mississippi Valley. As with Galt's wagons and Bralock's tires, Mississippi Valley never had an ownership interest in J&R's cattle; it did not even have an option to purchase. Rather, Mississippi Valley possessed the cattle solely for the purpose of selling them to Swift. Although Mississippi Valley did not return the cattle to J&R, Mississippi Valley disposed of the cattle as directed by J&R. In addition, the agreement required Mississippi Valley to

pay J&R immediately after the sales, as in *Galt*. This made Mississippi Valley J&R's undisclosed agent. Mississippi Valley had no ownership or potential ownership stake in the cattle. Bailment is the best legal description that Illinois law furnishes for this arrangement.

### 2.   Constructive Trust in Bankruptcy

Identifying Mississippi Valley as the bailee, however, is not enough. That is simply a stop along the way to determining whether some or all of the payments made to J&R were monies that the Trustee could recapture for the bankruptcy estate. Had Mississippi Valley sent the very same cattle back to J&R (as when a theater-goer retrieves her own car from a parking garage after the show), the case would be easy. The complicating fact is that Mississippi Valley transferred cash to J&R, not cattle, and money is fungible. The bankruptcy court had to create a link between J&R's cattle and the funds that Mississippi Valley sent to J&R. To accomplish this, the court needed to impose a constructive trust on the funds. Because a constructive trust is a device that should be used with care, this step requires our close scrutiny.

A constructive trust is an equitable remedy for certain claims in restitution. See generally Andrew Kull, *Restitution in Bankruptcy: Reclamation and Constructive Trust*, 72 AM. BANKR. L.J. 265 (1998) (cited as Kull). In Illinois, as in most states, the remedy is appropriate "[w]hen a person has obtained money to which he is not entitled, under such circumstances that in equity and good conscience he ought not retain it … to avoid unjust enrichment." *Smithberg v. Ill. Mun. Ret. Fund*, 735 N.E.2d 560, 565 (Ill. 2000); see also RESTATEMENT (FIRST) OF RESTITUTION § 160 (1937) ("Where a person holding title to property is subject to an equitable du-

ty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises.").

The remedy of constructive trust applies to a subset of unjust enrichment: that resulting from the unauthorized or invalid transfer of property. See Kull at 287–88. In such cases—for example, transfers effected by conversion, fraud, mistake, coercion, undue influence, or breach of fiduciary duty—the law provides that true ownership of the property never passes from transferor to transferee. Although the transferee (such as a bailee) may have actual and even legal possession, ownership remains vested in the transferor, who has a legal right to demand the return of the property. See *In re Teltronics, Ltd.*, 649 F.2d 1236, 1239 (7th Cir. 1981) ("The rule that property obtained by fraud is not part of the bankrupt's estate represents the policy that property should remain in the hands of its rightful owners, no matter how legitimate the claims of creditors."). The term "constructive trust" describes the legal fiction pursuant to which the transferee holds the property for the benefit of the true owner. It is a trust imposed by law, rather than one created through the voluntary act of the settlor. Just as the assets of a conventional trust do not enter the bankruptcy estate when the bankrupt person is the trustee, see 11 U.S.C. § 541(d); *Begier v. IRS*, 496 U.S. 53, 62–66 (1990); *In re Marrs-Winn Co.*, 103 F.3d 584, 589 (7th Cir. 1996); *Matter of Wayco, Inc.*, 947 F.2d 1330, 1332–33 (7th Cir. 1991), the assets of a constructive trust do not either.

The transferee in possession does not own the property any more than a parking garage owns a customer's car, or a pickpocket owns the wallet he swipes from a purse. Nor

does the transferee become the rightful owner of such property by filing a bankruptcy petition. This is the reason assets in a constructive trust are insulated from the claims of the debtor's general creditors. See *Belisle v. Plunkett*, 877 F.2d 512, 513 (7th Cir. 1989); see also 5 COLLIER ON BANKRUPTCY ¶ 541.28[2][a] (Alan N. Resnick & Henry J Somme eds., 16th ed. 2011). As Justice Black put it, "[t]he Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors." *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135–36 (1962).

We acknowledge that some courts have rejected this view of constructive trusts in bankruptcy. See, *eg.*, *In re Omegas Group, Inc.*, 16 F.3d 1443, 1451 (6th Cir. 1994) (citing Emily L. Sherwin, *Constructive Trusts in Bankruptcy*, 1989 U. ILL. L. REV. 297). They view the constructive trust as "fundamentally at odds with the general goals of the Bankruptcy Code" because, as they see it, that device privileges some creditors over others in a way unconstrained by the Code's mandates. *Omegas Group*, 16 F.3d at 1451 (quoting *In re Stotler & Co.*, 144 B.R. 385, 388 (N.D. Ill. 1992)). We, too, recognize that the constructive trust can subvert bankruptcy's distribution scheme if courts lose sight of the fact that it is an extraordinary equitable remedy, to be used sparingly. See *Amendola v. Bayer*, 907 F.2d 760, 763 (7th Cir. 1990) (citing *Suttles v. Vogel*, 533 N.E.2d 901, 904–05 (Ill. 1988)). But we trust that courts will not commit this error.

The Sixth Circuit, in its influential *Omegas Group* opinion, declared constructive trusts to be "anathema to the equities of bankruptcy," and it barred bankruptcy courts from imposing them "[u]nless a court has already impressed a constructive trust upon certain assets or a legislature has created a

specific statutory right to have particular kinds of funds held as if in trust." 16 F.3d at 1449. In its view, unjust enrichment does not exist in bankruptcy because the debtor does not benefit from the invalid possession of the claimant's property. *Id.* at 1452 (citing our opinion in *Belisle*, 877 F.2d at 516). Rather, because "the Code recognizes that each creditor has suffered disappointed expectations at the hands of the debtor … it makes maximization of the estate the primary concern." *Id.* "Imposing a constructive trust on the debtor's estate" the court concluded, "impermissibly subordinates this primary concern to a single claim of entitlement." *Id.* at 1452–53.

*Omegas Group* disagreed with the Fifth Circuit's decision in *Matter of Quality Holstein Leasing,* 752 F.2d 1009 (5th Cir. 1985), and so at most we need to choose sides on the question whether property subject to a constructive trust can be excluded from a bankruptcy estate. In our opinion, the Sixth Circuit's view draws too sharp a line between constructive trusts and ordinary trusts. We are confident that state law is up to the task of policing any possible abuses of the constructive trust. As we know, "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner*, 440 U.S. at 54. Moreover, to the extent that the Sixth Circuit relied on the idea that a constructive trust cannot exist until a court has expressly imposed that remedy, we understand that issue to be controlled by state law. We see nothing in Illinois law that calls for such a result. Finally, we note that *Omegas Group* has been sharply criticized in a leading treatise. See DOUGLAS LAYCOCK, MODERN AMERICAN REMEDIES 713 (4th ed. 2010).

When a restitution claim is made against a bankruptcy estate, the key question to ask is whether the estate—not the now-defunct debtor—would be unjustly enriched by keeping the claimant's property. See Kull at 279–80 ("Restitution in bankruptcy involves a kind of 'second-order' restitution, meaning that the transfer at issue is once removed from the transfer in which the restitution claim originates."). The court should focus its attention on the equities of the unauthorized transfer of the claimant's property to the debtor's creditors. See *id.*; *In re Dameron*, 206 B.R. 394, 400 (Bankr. E.D. Va. 1997); *In re Kamand Constr., Inc.*, 298 B.R. 251, 255 (Bankr. M.D. Pa. 2003); Sherwin, *Constructive Trusts in Bankruptcy*, 1989 U. ILL. L. REV. 297, at 317 (court should evaluate "equity of the remedy in the specific context of a contest between a constructive trust claimant and other creditors").

One question remains: How could the debtor's creditors (that is, the debtor's bankruptcy estate) gain an equitable interest when the debtor itself had none? To answer it, we must remember what, in substance, the constructive trust is designed to do. The question is not whether the debtor had a legitimate ownership interest in the disputed property. The question is whether the law should presume that the debtor was holding the property for the benefit of another. If so, then the rightful owner has a claim in restitution against the bankruptcy estate. The remedy for that claim, if proven, is return of the property, unless a good defense exists.

Even we have not always described this distinction as clearly as we might. See, *e.g.*, *Marrs-Winn*, 103 F.3d at 589 ("The bankruptcy court's jurisdiction over Marrs-Winn's property extends only as far as Marrs-Winn's particular interest in the property. … It is a well-settled principle that

debtors do not own an equitable interest in property that they hold in trust for another[.]"). But here is why the distinction matters: If the issue were only the statutory scope of the debtor's property, the debtor's creditors would always lose in a contest with a claimant who had a valid restitution claim against the debtor. But if the constructive trust is understood as the remedy for a restitution claim against the estate, the estate may be able to invoke certain defenses that were not available to the debtor.

For example, in this case, J&R allowed Mississippi Valley to sell J&R's cattle alongside Mississippi Valley's own cattle without notice to Mississippi Valley's other creditors about the true ownership of the cattle. This failure to notify third parties would have no bearing on J&R's restitution claim against Mississippi Valley itself. In some cases, however, such an arrangement may prevent the restitution claimant from asserting priority against the claims of the bailee's other creditors. See *Chickering v. Bastress*, 22 N.E. 542, 543 (Ill. 1889) ("[W]here one party, by means of contract, but without notice to the world, suffers the real ownership of chattels to be in himself, and the ostensible ownership to be in another, the law will postpone the rights of the former to those of the execution or attachment creditors of the latter[.]"); see also *Matter of Iowa R.R. Co.*, 840 F.2d 535, 545 (7th Cir. 1988) (denying constructive trust where "[n]othing in the way the Iowa did business would have alerted other creditors that the funds ostensibly in its control were held in trust").

It is also possible, though we do not resolve this, that J&R's anonymous use of Mississippi Valley in order to deceive Swift into buying its cattle might support the equitable defense of unclean hands for the Trustee. See *Baal v. McDon-*

*ald's Corp.*, 422 N.E.2d 1166, 1171 (Ill. 1981) ("Under Illinois law, misconduct on the part of a plaintiff which will defeat a recovery in a court of equity under the doctrine of 'unclean hands' must have been conduct in connection with the very transaction being considered or complained of, and must have been misconduct, fraud or bad faith toward the defendant making the contention."); see also Kull at 273 (suggesting that the constructive trust in *Omegas Group* could have been denied on the basis of unclean hands). Viewing constructive trust in bankruptcy for what it is—the remedy for a claim in restitution where the estate possesses property belonging to another—allows these defenses to be available to the estate.

We need not explore every nook and cranny in the complex area of constructive trust in bankruptcy. It is enough to say that, in bankruptcy, a restitution claimant must at a minimum prove its interest in specific property in the estate's possession to warrant the remedy of constructive trust. The estate, acting on behalf of the debtor's general creditors, may have state-law defenses against the restitution claim that the debtor did not have. On remand, the court should look to Illinois law to determine whether J&R has a good claim in restitution against the estate (and ultimately Mississippi Valley's creditors). The court should also consider whether equitable defenses bar J&R from recovering on that claim.

3.  Tracing Proceeds

Finally, we turn to tracing. Although tracing is an element of J&R's restitution claim, we discuss it separately to emphasize its importance. There can be no constructive trust without tracing a claimant's interest to specific property. See *Travelers Cas. & Sur. Co. of Amer., Inc. v. Northwestern Mut. Life*

*Ins. Co.*, 480 F.3d 499, 502 (7th Cir. 2007) ("The imposition of a constructive trust … requires the plaintiff to trace property that is rightfully his to the defendant."); see also 5 COLLIER ON BANKRUPTCY ¶ 541.28. Without tracing, the basic rationale of restitution falls away: the claimant can no longer point to its specific property in another's possession. Accordingly, to establish its right to a constructive trust over the funds that Mississippi Valley received from the sale of its cattle, J&R needed to trace the money it received to those proceeds. See *In re Comm'r of Banks & Real Estate*, 764 N.E.2d 66, 109–10 (Ill. App. Ct. 2001) (claimant has the burden to trace property in restitution claim).

The bankruptcy and district courts were right to recognize that commingled funds require special treatment. But they failed to identify what that special treatment entails. When tracing funds in a commingled account, the lowest-intermediate-balance rule determines the extent of the claimant's interest in the account. *C.O. Funk & Sons, Inc. v. Sullivan Equip., Inc.*, 431 N.E.2d 370, 372 (Ill. 1982); *In re Comm'r of Banks & Real Estate*, 764 N.E.2d at 101. This doctrine assumes that the debtor withdraws its own funds first and leaves the trust funds intact. If the balance of the account dips below the amount of deposited proceeds, the claimant's interest abates accordingly. The claimant's interest does not increase if the debtor later deposits additional funds into the account. Rather, "the claimant has no priority over other creditors to any amount in excess of the lowest intermediate balance." *C.O. Funk & Sons*, 431 N.E.2d at 372–73.

The lowest-intermediate-balance rule caps the restitution claimant's interest because later deposits are made with as-

sets to which all the debtor's creditors have an equivalent claim. If multiple restitution claimants successfully trace their property back to the same commingled account, these claimants share the traced funds *pro rata*. The same equitable principle may rebut the assumption that the debtor spends its own money first. In a Ponzi scheme, for example, the fraud operates by paying "investors" with other victims' deposits. In such a case, all victims of the fraud may have equivalent claims, thus destroying any particular victim's entitlement to a constructive trust over the entire pool. "Between claimants similarly situated, the equities of restitution (like the equities of bankruptcy) favor ratable distribution." See Kull at 285. *Cf. In re Foos*, 183 B.R. 149, 152–54 (Bankr. N.D. Ill. 1995) (erroneously applying *Omegas Group* to deny constructive trust over debtor's Ponzi scheme proceeds).

But even fraud victims must trace. In *Cunningham v. Brown*, 265 U.S. 1 (1924), the Supreme Court considered a bankruptcy trustee's avoidance action against an alleged preferential payment to a victim of the debtor Charles Ponzi's scheme. The Court assumed that the payment redressed a fraud, but it nevertheless granted the trustee's preference action. The Court explained:

> [The recipient of the alleged preference] could have followed the money wherever they could trace it and have asserted possession of it on the ground that there was a resulting trust in their favor … . [This] they could do without violating any statutory rule against preference in bankruptcy, because they then would have been endeavoring to get their own money, and not money in the estate of the bankrupt. But to

> succeed they must trace the money, and therein they have failed. … In such a case, the defrauded lender becomes merely a creditor to the extent of his loss and a payment to him by the bankrupt within the prescribed period … is a preference.

*Id.* at 12–13. The same tracing logic applies in this case.

## IV

Based on the facts found by the bankruptcy court, it appears likely that a constructive trust over the funds in Mississippi Valley's account was in some amount proper. Mississippi Valley took J&R's property (the cattle), sold it, and held the proceeds for J&R's benefit. But we cannot find anything in the record to tell us such critical things as how much money was in Mississippi Valley's account, what the lowest intermediate balance of the account was after the proceeds were deposited, and thus whether all of the money was properly impressed with the trust. In other words, J&R has not yet shown that all of the funds paid were its property. Nor can we be certain that the courts below have given adequate consideration to potential defenses available to the estate. Because we cannot determine whether the transferred funds were "an interest of the debtor in property" as required to support the trustee's preference action under 11 U.S.C. § 547, we remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.